ACCEPTED
03-14-00713-CV
6156364
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/21/2015 1:12:23 PM
JEFFREY D. KYLE
CLERK

## No. 03-14-00713-CV

_____

IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/21/2015 1:12:23 PM
JEFFREY D. KYLE
Clerk

_____

# Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas,
### *Appellants*

## v.

# CGG Veritas Services (U.S.), Inc.,
### *Appellee.*

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
CAUSE NO. D-1-GN-12-001316, HONORABLE TIM SULAK PRESIDING

# APPELLEE'S BRIEF

Amanda G. Taylor
ataylor@textaxlaw.com
Texas Bar No. 24045921
James F. Martens
jmartens@textaxlaw.com
Texas Bar No. 13050720
Lacy L. Leonard
lleonard@textaxlaw.com
Texas Bar No. 24040561
Danielle Ahlrich
dahlrich@textaxlaw.com
Texas Bar No. 24059215

**MARTENS, TODD, LEONARD,
TAYLOR & AHLRICH**
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Tele: (512) 542-9898
Fax: (512) 542-9899


ATTORNEYS FOR APPELLEE,
CGG VERITAS SERVICES (U.S.),
INC.

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

INDEX OF AUTHORITIES ....................................................................v

RECORD ABBREVIATIONS ..................................................................ix

REQUEST FOR ORAL ARGUMENT.....................................................x

RESPONSIVE ISSUES PRESENTED....................................................xi

STATEMENT OF FACTS .......................................................................1

    I.    CGG PRODUCES AND SELLS SEISMIC DATA FOR USE IN OIL & GAS PROJECTS..................................................................1

        A.    The Acquisition and Production of Seismic Data Requires Physical and Mental Effort that is Difficult and Costly. ..............................................................1

        B.    Seismic Data is Essential to Drilling Projects.....................5

        C.    Sales to Proprietary Customers. ........................................7

        D.    Sales through Multi-Client Data Library (MCDL). ............ 8

    II.    PROCEDURAL HISTORY. ................................................. 11

        A.    CGG Calculated its 2008 Franchise Taxes Using the COGS Deduction. ............................................................. 11

        B.    The Comptroller Denied the COGS Deduction and Assessed Additional Taxes Based on Incomplete Information. ......................................................................12

        C.    CGG Paid the Assessment Under Protest and Filed Suit.............................................................................14

D.    The Comptroller's Counterclaim Was Separately Resolved. ...................................................16

E.    CGG Has "Apportionment" Claims Separately Pending at the Administrative Level. ................16

F.    The Trial Court Entered a Final Judgment and Made Findings and Conclusions in Favor of CGG......................18

SUMMARY OF THE ARGUMENT .....................................................19

STANDARDS OF REVIEW ...............................................................22

I.    STATUTORY CONSTRUCTION............................................22

II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW. ...............23

ARGUMENT ....................................................................................25

I.    FRANCHISE (MARGIN) TAX CALCULATION. ......................25

II.    THE COGS DEDUCTION, SECTION 171.1012. .................. 28

A.    Does the Taxpayer Qualify for the COGS Deduction?...... 28

B.    What Costs are Allowed for the COGS Deduction? .......... 30

III.    CGG QUALIFIES FOR THE COGS DEDUCTION. ............................... 30

A.    CGG Qualifies as a "Deemed Owner." ............................... 31

1.    CGG furnishes labor and materials.........................32

a.    Labor............................................................. 33

b.    Materials. ...................................................... 34

c.    The Comptroller's categorical attempt to separate "labor and materials" from "geological and geophysical" work misinterprets the statute. ..............................35

ii

d. The Comptroller's argument that CGG's work is a "service" that is not "fatiguing, difficult, or compulsory" enough to constitute "labor" is an improper recast of its previously-rejected "physical change" theory. .............................................. 40

e. The Comptroller's two-sentence argument regarding "materials" is unavailing...................................................... 44

2. CGG's activities are sufficiently connected to a real-property improvement project. ........................45

B. CGG Qualifies as an "Actual Owner." ............................... 50

1. CGG owns and sells seismic data. ........................... 50

2. The seismic data is a "good" for purposes of the COGS deduction. ...................................................... 51

a. TPP for COGS is different than TPP for sales tax or apportionment. ........................... 54

b. CGG's seismic data satisfies the definition in Section 171.1012(a)(3)(A)(ii)........................................57

IV. ALL OF CGG'S COSTS ARE ALLOWED FOR THE COGS DEDUCTION..................................................................................63

A. The Comptroller Waived Any Challenge to the Actual Costs Deducted..................................................................63

B. The Statute Does Not Require Parsing of Costs. ...............65

V. NO DEFERENCE IS OWED TO THE COMPTROLLER'S POSITIONS. ......... 68

PRAYER ...................................................................................70

CERTIFICATE OF COMPLIANCE ................................................ 71

CERTIFICATE OF SERVICE .......................................................72

APPENDIX:

1.    **P.Ex.4**, p.D0062-68: August 2010 Auditor Dullum's Notes

2.    **P.Ex.5**: September 2010 Additional Tax Assessment

3.    **P.Ex.19**: CGG's COGS Calculation, Breakdown

4.    **P.Ex.48**: CGG's COGS Calculation, Overview

# INDEX OF AUTHORITIES

## CASES

*American Multi-Cinema, Inc. v. Hegar,*
     No. 03-14-00397-CV, --S.W.3d --, 2015 WL 1967877
     (Tex. App.—Austin Apr. 30, 2015, no. pet. h.) ........................... *passim*

*Avis v. First Nat. Bank of Wichita Falls,*
     174 S.W.2d 255 (Tex. 1943) ..............................................................51

*City of Keller v. Wilson,*
     168 S.W.3d 802 (Tex. 2005 ..............................................................60

*Combs v. Newpark,*
     422 S.W.3d 46 (Tex. App.—Austin 2013, no pet.)....................... *passim*

*Combs v. Roark Amusement & Vending, L.P.,*
     422 S.W.3d 632 (Tex. 2013) ................................................. 23, 49, 68

*DPRS 15th St., Inc. v. Texas Skyline, Ltd.,*
     No. 03-11-00101-CV, 2014 WL 4058796 (Tex. App.—Austin
     Aug. 13, 2014, no pet.) ...................................................................... 24

*Graham Cent. Station, Inc. v. Pena,*
     442 S.W.3d 261 (Tex. 2014).............................................................. 24

*Greater Houston P'ship v. Paxton,*
     No. 13-0745, 2015 WL 3978138 (Tex. June 26, 2015) ....................... 22

*Houston Fire & Cas. Ins. Co. v. Hales,*
     279 S.W.2d 389 (Tex. Civ. App.—Eastland 1955, writ ref'd n.r.e.)...... 45

*In re Bass,*
     113 S.W.3d 735 (Tex. 2003) ............................................................. 61

*In re Nestle USA, Inc.,*
        387 S.W.3d 610 (Tex. 2012) .......................................................... 25, 27

*McGalliard v. Kuhlmann,*
        722 S.W.2d 694 (Tex. 1986) ............................................................. 24

*Murray v. Grayum,*
        No. 03-10-00165-CV, 2011 WL 2533796 (Tex. App.—Austin
        June 24, 2011, pet. denied) ............................................................. 24

*Roark Amusement & Vending, L.P. v. Combs,*
        2011 WL 255535 (Tex. App.—Austin Jan. 26, 2011),
        *aff'd by* 422 S.W.3d 632 (Tex. 2013) ................................................. 69

*Sneed v. Webre,*
        12-0045, 2015 WL 3451653 (Tex. May 29, 2015) .............................. 38

*TGS-NOPEC Geophysical Co. v. Combs,*
        340 S.W.3d 432 (Tex. 2011) ...................................................... *passim*

*Titan Transp., LP v. Combs,*
        433 S.W.3d 625 (Tex. App.—Austin 2014, pet. denied) .......... 26, 27, 42

*Upjohn Co. v. Rylander,*
        38 S.W.3d 600 (Tex. App.—Austin 2000, pet. denied) ................. 69, 70

*USA Waste Servs., Inc. v. Strayhorn,*
        150 S.W.3d 491 (Tex. App.—Austin 2004, pet. denied) ...................... 68

*Vinson v. Brown,*
        80 S.W.3d 221 (Tex. App.—Austin 2002, no pet.) ............................. 24

*W. L. MacAtee & Sons v. House,*
        153 S.W.2d 460 (Comm'n of App. adopted by Sup.Ct.) ...................... 45

*Zimmer US, Inc. v. Combs,*
      368 S.W.3d 579 (Tex. App.—Austin 2012, no pet.) ............................ 22

## STATUTES & RULES

34 Tex. Admin. Code § 3.588 ...................................................... 29, 31, 51, 52

Tex. Gov't Code § 311.005 ....................................................................38

Tex. Gov't Code § 311.012 .................................................................... 47

Tex. Gov't Code Ch. 2001 .................................................................... 42

Tex. R. App. P. 9.4 ...............................................................................71

Tex. R. App. P. 9.5 ............................................................................... 72

Tex. R. App. P. 38.1 ........................................................................ x, 44

Tex. R. App. P. 39.1 .................................................................................. x

Tex. R. App. P. 43.4 ........................................................................... 70

Tex. R. Civ. P. 139 ............................................................................. 70

Tex. Tax Code § 112.052 ...................................................................... 15

Tex. Tax Code § 112.060 ...................................................................... 15

Tex. Tax Code § 121.151 ...................................................................... 17

Tex. Tax Code § 151.0031 .................................................................... 52

Tex. Tax Code § 151.009 ................................................................ 54, 55

Tex. Tax Code § 171.051 ................................................................. 69

Tex. Tax Code § 171.088 ................................................................. 69

Tex. Tax Code § 171.103 ............................................... 17, 51, 54, 56

Tex. Tax Code § 171.1012 ........................................................ *passim*

Tex. Tax Code § 171.1013 ................................................................. 26

Tex. Tax Code § 171.1014 ....................................... 11, 27, 37, 66

## OTHER AUTHORITIES

Merriam-Webster's Collegiate Dictionary 765 (11th ed. 2012) ...................... 35

Texas Comptroller of Public Accounts, *Letter Ruling* 201504069L
(April 23, 2015) .................................................................... 67

Texas Comptroller of Public Accounts, *Memorandum from Tax Policy
Division*, 201406920L (June 10, 2014) ............................................. 43

Webster's Third New International Dictionary 1259,
2075 (Phillip Gove Ed. 2002) ....................................................... 33

# RECORD ABBREVIATIONS

Appellee uses the following abbreviated references to the record:

| Abbreviation | Reference |
| --- | --- |
| **CR** | Clerk's Record (1 volume) |
| **1.RR to 3.RR** | Volumes 1-3 of the Reporter's Record, Trial Transcript |
| **4.RR.P.Ex, 5.RR.D.Ex** | Volumes 4-5 of the Reporter's Record, Plaintiff's and Defendants' Trial Exhibits<br><br>Excerpts from three depositions were admitted to be considered as part of the trial testimony (2.RR.10, 32-36).<br><br>**4.RR.P.Ex.46**: Sarah Pai, the Comptroller's corporate representative.<br><br>**5.RR.D.Ex.36**: John Bastenagle, CGG's regional marketing and sales manager.<br><br>**5.RR.D.Ex.35**: Kay Hanson-Clerc, CGG's vice-president/multi-client controller worldwide. |
| **1.Supp.RR** | Supplemental Reporter's Record, Transcript of Hearing on Motion to Enter Judgment |

# REQUEST FOR ORAL ARGUMENT

Appellee CGG Veritas Services (U.S.), Inc. respectfully requests that this Court grant oral argument to aid in the Court's decisional process. Although this Court has previously analyzed portions of Texas Tax Code Section 171.1012 (*i.e.*, the cost of goods sold (COGS) provision at issue here), CGG agrees with the Comptroller that this case presents additional issues of first impression beyond the Court's prior holdings. Oral argument will assist the Court in understanding the statutory framework and reasonable interpretation of these provisions. Tex. R. App. P. 38.1(e), 39.1.

# RESPONSIVE ISSUES PRESENTED

There is only one issue in this case:  Did the trial court correctly decide that the Comptroller (Appellants) improperly disallowed the $567 million cost of goods sold (COGS) deduction claimed by CGG (Appellee) in calculating its margin for franchise tax report year 2008?  The answer is yes and the judgment should be affirmed in full.

In response to the sub-issues raised by the Comptroller:

1. CGG correctly calculated its franchise taxes using the COGS deduction because it qualifies as an "owner of goods" under Texas Tax Code Section 171.1012(i).  CGG qualifies as:

   a. a "deemed owner" because it "furnishes labor or materials to a project for the construction or improvement of real property" by acquiring and producing seismic data that is an essential part of the oil and gas drilling process. [Responsive to Issues 3-4.]

   b. an "actual owner" because it owns the seismic data that it sells through a "multi-client data library" (MCDL), and that data/images satisfies the definition of "goods" because the Legislature has chosen to treat this otherwise "intangible" property as an artificial form of "tangible personal property" exclusively for purposes of the COGS deduction.  [Responsive to Issue 1.]

2. As a qualifying owner, the statute directs CGG to deduct all of the costs allowed under Sections 171.1012(c), (d), and (f), which total $567 million for report year 2008.  The Comptroller failed to preserve any argument at trial that this amount should be parsed by business activity or by cost category.  [Responsive to Issue 3.]

3. No deference is owed to the Comptroller's positions because: (a) the statute is unambiguous, (b) the Comptroller's arguments are unreasonable, and (c) the COGS deduction is akin to an "exclusion" rather than an "exemption" from tax. [Responsive to Issue 5.]

**STATEMENT OF FACTS**

**I.** **CGG PRODUCES AND SELLS SEISMIC DATA FOR USE IN OIL & GAS PROJECTS.**

Appellee CGGVeritas Services (U.S.), Inc. ("CGG") is "a fully-integrated geoseismic company." (2.RR.73; CR.266 at FOF.2). CGG's customers are "E&P companies": companies that explore for and produce oil and gas. (2.RR.73-74; 5.RR.D.Ex.35, p.10; CR.266 at FOF.5). "CGG designs, acquires, processes, [and] occasionally interprets seismic data" in a manner that "aids in the construction of [its customers'] oil and gas wells." (2.RR.74, 144; 4.RR.P.Ex.7, §§ 1, 4.1; 5.RR.D.Ex.3-12, 15; CR.265-66 at FOF.2-10).

**A.** **The Acquisition and Production of Seismic Data Requires Physical and Mental Effort that is Difficult and Costly.**

CGG produces seismic images by collecting "sound waves" and then "writ[ing] them out to some form of media." (2.RR.76; CR.265 at FOF.3). A large crew of workers using powerful materials and equipment, which "make a physical impact on the property," are required to create the sound waves. (2.RR.106, 111; 3.RR.9; 4.RR.P.Ex.22; 4.RR.P.Ex.47). CGG's materials and equipment include dynamite, large vibroseis trucks that shake the ground, marine "airguns" that "make a large bang in the water," and GPS satellites. (2.RR.76, 80-88, 134-35).

1

To shoot seismic on land, the dynamite is often placed 100-200 feet below the surface, with tens or hundreds of thousands of "shot hole" placements, by a crew of 75-100 people. (2.RR.82-83, 106; 3.RR.8-9). The vibroseis trucks weigh between 60,000 to 90,000 pounds, and there are normally five or six of them in the field. (2.RR.85, 106). The vibration created by these trucks leaves a four-inch indentation to the earth below. (2.RR.86, 106). For marine settings, CGG uses "as many as 50 airguns in an array" and a vessel "about 300 feet long." (2.RR.87). For example:





(4.RR.P.Ex.47, p. 5, 7, 10) (in color, as admitted at trial).

CGG furnishes a variety of other materials in connection with the use of its large equipment.  For example, in one of its customer's projects, CGG was required to supply the following materials:

2.  **Recording and Source Equipment**

The Contractor must supply:

| Equipment | |
|---|---|
| Personnel Carriers | 2 |
| Recorder | 1 |
| Battery Shack | 1 |
| Line Trucks | 3 |
| Vibrator Tech Truck | 1 |
| Vibrator Fuel Truck | 1 |
| Observers Truck | 1 |
| Equipment Trailers | 2 |
| Misc. Trailers | 2 |
| Recording System(s) | Sercel 408 FDU/DSU |
| Sercel 408 FDU | 800 |
| Sercel 408 DSU | 1000 |
| Sercel LAUX + Batteries | 10 |
| Sercel LAUL | 55 |
| Transverse Cables | 10 |
| Geophones | 815 |
| Truck-mounted Vibrators | 5 |

(4.RR.P.Ex.9, p.12).

3

CGG's labor generate sound waves that "illuminate the subsurface of the earth," and allow CGG to "produce a three-dimensional image . . . to see below the surface." (2.RR.76, 81; 3.RR.7-8; 5.RR.D.Ex.15; 5.RR.D.Ex.36, p.9-11; CR.265 at FOF.2, 4). The "seismic data in its raw form is written out onto some sort of media, like magnetic tapes or USB drives." (2.RR.81; 3.RR.7).

This is an "extremely specialized" process. (2.RR.88; 3.RR.21-22; CR.265 at FOF.4). CGG does "[s]ome minor processing on site" at the intended drilling location but then turns the raw sound recordings into seismic images using "high-powered algorithms" at its processing center. (2.RR.89, 133; 3.RR.7; 5.RR.D.Ex.36, p.14). This requires complex hardware and software, and "a lot of highly-trained and experienced people." (2.RR.90, 112-13; 3.RR.10; 4.RR.P.Ex.14, p.18). Generating seismic images is "a lot of science and somewhat of an art." (2.RR.141). As one CGG employee described it by simplified analogy: "the raw data is like a black and white [photograph]. . . . I colorize it and I touch it up. And I print it out in a form that you can use." (5.RR.D.Ex.36, p.26). Generally, "[t]he ultimate output is a high resolution digital image of the subsurface of the earth." (2.RR.92). For example:

4



(4.RR.P.Ex.47, p.14) (in color, as admitted at trial).

The time spent by CGG's workers to acquire seismic date and produce seismic images ranges from several months to several years. (2.RR.91, 137-39). This process is very expensive. The "average" cost is "tens of millions of dollars" and it can be as high as "hundreds of millions of dollars." (3.RR.24-25).

## B.    Seismic Data is Essential to Drilling Projects.

The geo-seismic work performed by CGG "constitutes an integral part" of its customers' oil and gas production business. (2.RR.102; CR.266 at FOF.6-7, 10). The contracts between CGG and its E&P customers expressly recognize that CGG's work is performed for "the benefit of the [customer]"; that "[t]he work performed by [CGG] . . . is part of [the customer's] trade,

business, or occupation"; and "[a]s such, [CGG's] work constitutes an integral part of the [customer's] business necessary to generate [customer's] goods, products, and services." (4.RR.P.Ex.7, §§ 1, 4.1). CGG's work is "important to the entire drilling project." (2.RR.130). All of CGG's customers intend to use the seismic data to construct productive oil and gas wells. (3.RR.26-27). None of CGG's customers pay for the acquisition and production of seismic data simply to ignore it and drill regardless of the information they see on the seismic images. (2.RR.130).

The purpose of the geophysical work performed by CGG is to locate oil and gas for drilling and production. (2.RR.101; CR.266 at FOF.6-7, 10). CGG's seismic data provides a "roadmap" or a "blueprint for the project," which its customers use "as a guide [for] where to drill the wells, [and] how deep to drill the wells." (2.RR.75-76, 130). By demonstrating the "porosity, permeability, rock type, . . . [and] depth" of the earth's subsurface, CGG's seismic images allow petroleum companies "to identify fairly clearly potential places to drill." (2.RR.94-96). The data can also show "geo-hazards," like an "overpressurized zone[] . . . that would be dangerous to the drilling operations." (2.RR.130). In these instances, the data helps a customer determine that it should drill elsewhere. (2.RR.130).

The subsurface of the earth is complex and non-uniform. There may be salt domes and other structures under the surface that would prevent one from reaching the oil and gas reservoirs if they were to just drill straight down without the use of a seismic data map. (2.RR.78-80, 93). "[Y]ou have to have a high-resolution image to be able to do that." (2.RR.80). The seismic map (especially in 4-D format) can identify mineral resources that were otherwise compartmentalized and bypassed with prior methods. (2.RR.116-17; 3.RR.24; 4.RR.P.Ex.14, § 1.5).

## C. Sales to Proprietary Customers.

CGG performs its work for both "proprietary" and "non-proprietary" customers. (2.RR.117; CR.265 at FOF.2). A proprietary customer is typically an E&P company that pays CGG to develop and sell it seismic images of an area designated by the customer for the customer's exclusive ownership and use. (2.RR.117). Proprietary customers acquire all rights to the seismic data (both raw data and processed images). (2.RR.117, 134). This information is confidential and provides a valuable edge over competitors. (2.RR.117).

CGG enters a Master Agreement for Geophysical Services with its proprietary customers. (2.RR.101, 108-09; 4.RR.P.Ex.7; 4.RR.P.Ex.12). The contract states the basic scope of work and describes the labor and materials

to be furnished to the project, as illustrated above. (2.RR.105, 109, 111; *see, e.g.*, 4.RR.P.Ex.7, p.1, 9, Schedules; 4.RR.P.Ex.9, p.12, 15-18).

CGG gets involved "early on" in the customer's drilling project. (2.RR.75). By this point, the typical customer has identified a prospective drilling area based on "a lot of geologic work" and has "establish[ed] a lease position" that will allow them to drill there. (2.RR.75, 96). The customers specify the area where they want CGG to shoot seismic, the scope of CGG's work, and the necessary timeline. (2.RR.97). In some cases, a customer may already own the raw data and provide it to CGG for processing. (2.RR.98, 141-42; 5.RR.D.Ex.36, p.12).

Because CGG's seismic data is critical to the success of an oil and gas project, CGG must deliver its products timely and keep the customer informed. (2.RR.128; 3.RR.22-23). CGG provides frequent updates, and the customers often have on-site representatives. (2.RR.128-29; 3.RR.25). CGG may provide intermediate seismic images to help the customer make prompt decisions about when and where to drill. (2.RR.140; 3.RR.26).

### D.    Sales through Multi-Client Data Library (MCDL).

The non-proprietary division of CGG's business is called the "multi-client data library" (MCDL). (2.RR.118; CR.266 at FOF.11). When a drilling area is "hot" with several E&P companies interested, CGG may choose to

fund the up-front cost of acquiring the data and producing the seismic images. (2.RR.118, 121; 4.RR.P.Ex.18). Sometimes, customers approach CGG requesting that it produce MCDL images for a certain area, and they help fund the project. (3.RR.19; 5.RR.D.Ex.36, p.12). Either way, to ensure the endeavor is profitable, CGG will generally not begin MCDL work unless it has a requisite minimum of "pre-commitments" from customers who want to use the images. (*See* 5.RR.D.Ex.13, p.23-24).

CGG then puts those products "on the shelf" and "try[s] to sell them to as many people as possible." (2.RR.118-19; 3.RR.20; 4.RR.P.Ex.18; 5.RR.D.Ex.35, p.8, 12-13). The data available for any particular area can be delivered in several different mediums or "derivatives," ranging from the raw sound recordings to a fully-processed image. (2.RR.118-19, 122; 3.RR.13-14; 4.RR.P.Ex.17; 5.RR.D.Ex.36, p.20).

The labor and materials necessary to acquire, process, and sell seismic data is the same for the MCDL products as it is for the proprietary customers. (5.RR.D.Ex.36, p.12-13, 17). The only difference is that, with proprietary customers, CGG sells the exclusive rights to the data to one customer, while with MCDL customers, CGG sells a non-exclusive license to use the data to as many customers as possible. (5.RR.D.Ex.35, p.13, 16-17).

CGG enters a "Master Geophysical Data-Use License Agreement" with MCDL customers. (2.RR.122, 124, 126; 4.RR.P.Ex.10; 4.RR.P.Ex.17; 5.RR.D.Ex.35, p.17). The customer purchases a "license to use" the seismic data product. (2.RR.123, 125, 134; 5.RR.D.Ex.35, p.11, 17). CGG maintains ownership of the underlying seismic data. (2.RR.123-24; 5.RR.D.Ex.36, p.13, 17, 19). The Agreement specifies what the customer can do with the data and places restrictions on the customer's ability to share the information. (2.RR.125, 143; 5.RR.D.Ex.35, p.17; 5.RR.D.Ex.36, p.28-29). Supplements to the Agreement describe the medium of the data being licensed. (2.RR.126-28; 5.RR.D.Ex.35, p.17-18).

CGG's goal is to sell its MCDL data "to as many people as [it] can," regardless of the medium. (2.RR.119, 125; 3.RR.13; CR.267 at COL.13). Of the 11,854 oil and gas companies registered with the Texas Railroad Commission, CGG intends to sell its MCDL products to "[a]ll of them." (2.RR.120; 4.RR.P.Ex.25). As of trial, CGG had actively worked with more than half (over 6,000) of those companies. (2.RR.120). It has licensed the same seismic image for a single area to as many as 114 companies. (3.RR.17; CR.266 at FOF.12).

## II. PROCEDURAL HISTORY.

### A. CGG Calculated its 2008 Franchise Taxes Using the COGS Deduction.

CGG timely filed its 2008 Texas Franchise Tax Report paying approximately $1.3 million in taxes. (3.RR.33; 4.RR.P.Ex.1; CR.267 at FOF.14). CGG calculated its taxable margin by first determining its revenue and then deducting its allowable costs of goods sold ("COGS") from that amount. (3.RR.37-39); *see infra*, Argument I.

CGG is a "combined group" that is required to calculate its franchise taxes in accordance with Texas Tax Code Section 171.1014. (3.RR.34-37, 39). As such, CGG must "file[] a single tax report . . . elect[ing] to take the same general deduction [for] all members" of its integrated company. *See Combs v. Newpark*, 422 S.W.3d 46, 48 (Tex. App.—Austin 2013, no pet.).[1] Upon calculating the COGS amounts attributable to each of CGG's members and summing them together, CGG's total COGS amount for report year 2008 was $567,600,223 (hereafter, "$567 million"). (3.RR.41; 4.RR.P.Ex.1; 4.RR.P.Ex.19; CR.267 at FOF.15).[2]

---

[1] The Comptroller does not raise any argument related to CGG's combined group status as it did in *Newpark*, 422 S.W.3d at 52.

[2] There is a typographical error in FOF.15(c): it should cite Section 171.1012(f) rather than subsection (e) regarding indirect or administrative overhead costs. (*See* 4.RR.P.Ex.1, line 12).

CGG's tax department determined that it was eligible for the COGS deduction based on frequent communication with the project managers and personal knowledge about the nature of CGG's business, including the facts underlying the revenues and expenses reported in CGG's general ledger. (3.RR.40; 4.RR.P.Ex.21). They used this information to capture CGG's costs, and included in the COGS calculation only the costs eligible for deduction under the statute. (3.RR.40-41, 48-52, 54-56; 4.RR.P.Ex.19; 4.RR.P.Ex.48; 5.RR.D.Ex.35, p.15); *see* Tex. Tax Code § 171.1012(c), (d), (e); *infra*, Argument IV. CGG's federal and state tax director, Ms. Listya Diyah—who holds master's degrees in both tax and finance, and has decades of corporate experience in these areas (3.RR.29-32)—personally reviewed the source documents and the calculations, and believes all of the numbers are accurate. (3.RR.42-43, 53).

## B. The Comptroller Denied the COGS Deduction and Assessed Additional Taxes Based on Incomplete Information.

After CGG filed its tax report, it received a letter stating that the Comptroller was reviewing whether CGG qualified for the COGS deduction. (3.RR.44-45; 4.RR.P.Ex.2). The letter expressly stated that "[t]his review is not an audit" but it directed CGG to "complete the enclosed form" and return it within 15 days. (4.RR.P.Ex.2; *see also* 3.RR.81). The one-page form

requested only two pieces of information: (1) a description of the entity's activities, and (2) a list of items included in the COGS calculation. (4.RR.P.Ex.3). CGG timely responded with this information. (3.RR.46-47; 4.RR.P.Ex.3). CGG anticipated that the Comptroller would then initiate a formal audit but it did not receive any further communications in that regard. (3.RR.47-48).

Instead, CGG received a letter stating that the Comptroller had completed his review of CGG's 2008 franchise tax report, and "determined that [CGG] did not qualify for the [COGS] deduction." (3.RR.48; 4.RR.P.Ex.5; CR.267 at FOF.16). The Comptroller included a bill assessing CGG an additional $1,301,568 (hereafter, "$1.3 million") in tax plus interest. (3.RR.48, 54; 4.RR.P.Ex.5).

Mr. Gary Dullum, an auditor for the Comptroller, was responsible for reviewing CGG's information, making the decision to deny its COGS deduction, and assessing CGG an additional $1.3 million in taxes. (3.RR.64, 78-79, 82-83; 4.RR.P.Ex.4-5). He did so as part of the Comptroller's larger "Cost of Goods Sold Project," which targeted taxpayers statewide whom the Comptroller believed to be "service providers" or "something other than . . . manufacturing or retail or wholesale" providers. (3.RR.80, 91-92).

In making his decision about CGG's 2008 taxes, Dullum never spoke to CGG's named representative, tax director Stephen Marshall. (3.RR.82; 4.RR.P.Ex.4, p.D0064). Dullum never visited CGG's facilities nor otherwise examined the nature of CGG's business (beyond the two pages of information provided by CGG in response to the Comptroller's form and a "tour" of CGG's website). (3.RR.83; *see* 4.RR.P.Ex.3; 4.RR.P.Ex.4, p.D0066). His notes reflect that he was not even aware of the work CGG performed for its proprietary customers. (4.RR.P.Ex.4, p.D0065). Dullum spent a total of 3 hours conducting a "limited" review before deciding to assess CGG an additional $1.3 million in taxes. (3.RR.83; 4.RR.P.Ex.4, p.D0062, 65).

Dullum's incorrect conclusion was based on his misunderstandings that CGG is merely a "service provider" and that Section 171.1012(i) requires a taxpayer to "affect a physical change" to real property to qualify for the COGS deduction—a litigating position taken at trial but now publically abandoned by the Comptroller. (3.RR.80, 84-85, 88-89, 141; 4.RR.P.Ex.4, p.D0066; 4.RR.P.Ex.46, p.31); *infra*, Argument III.A.1.d.

## C. CGG Paid the Assessment Under Protest and Filed Suit.

CGG paid $1,483,233 under protest covering the $1.3 million in additional taxes plus interest accrued through the date of payment.

(4.RR.P.Ex.6; CR.267 at FOF.17-18). CGG filed a protest letter with this payment explaining, *inter alia*, why it qualified for the COGS deduction in the full amount of $567 million. (4.RR.P.Ex.6). CGG thereafter filed suit asserting these same grounds and seeking a full refund with interest. (3.RR.54; CR.4-10, 265 at FOF.1); *see also* Tex. Tax Code §§ 112.052, 112.060. This claim was tried to the bench before the Honorable Tim Sulak in Travis County.

Although CGG maintains that it qualifies to deduct the full COGS amount and is entitled to a full refund on this basis, at trial it proved five alternative calculations based on its various business activities. (3.RR.52-55; 4.RR.P.Ex. 49). CGG also provided a break-down of all of the costs included in its COGS deduction by each category allowed for deduction under Sections 171.1012(c), (d), and (f). (3.RR.40-41, 48-52, 54-56; 4.RR.P.Ex.19; 4.RR.P.Ex.48).

At trial, the Comptroller challenged only whether CGG qualified for the COGS deduction under Section 171.1012(i). It preserved no argument about whether the specific costs included in CGG's COGS calculation are allowed for deduction under subsections (c), (d), and (f). (*See* 2.RR.16; 3.RR.58-63, 91-98; CR.41-66); *infra*, Argument IV.A. The Comptroller rested without presenting any evidence. (3.RR.161). The court "rule[d] in favor of [CGG]

15

for the full amount of the refund sought" and requested that CGG prepare an appropriate order. (CR.217).

### D. The Comptroller's Counterclaim Was Separately Resolved.

The Comptroller counter-claimed that the amount of "research and development (R&D) credit" claimed by CGG for report year was too high. (CR.25-32). That claim was bifurcated and, following the COGS bench trial, it was resolved by a joint stipulation. (CR.35, 188-89). The parties stipulated that "the amount of the R&D carry-forward credit available for [CGG] to claim beginning with its 2008 Texas Franchise Tax Report is $782,268." (CR.188-89).

### E. CGG Has "Apportionment" Claims Separately Pending at the Administrative Level.

Following resolution of the only two claims in this lawsuit, both parties agreed that it was appropriate for the court to sign a final judgment that the Comptroller owes CGG a tax refund for report year 2008. (CR.194, 200, 202-03). However, the parties disagreed about how to calculate that refund in light of separately-pending administrative claims regarding the "apportionment factor" to be used in calculating CGG's 2008 taxes. (CR.203-

07, 228-230); *see* Tex. Tax Code § 121.151 (requiring that CGG initiate these claims at the administrative level).[3]

If CGG prevails on its separate apportionment claims, it will further decrease the "tax due" amount shown on line 30 of its 2008 franchise tax report. (CR.206-07, 220). This, in turn, will impact how much of the R&D credit CGG applies to its 2008 taxes versus carries forward for application to future years because the credit is capped at 50% of the tax due amount for any given year. (CR.207, 220, 225; 1.Supp.RR.19). In combination, this could result in an additional refund owed to CGG of approximately $1 million. (CR.206; 1.Supp.RR.9, 11).

CGG was concerned that, if the judgment calculated a "final refund" amount, the Comptroller would later argue CGG was barred by res judicata or collateral estoppel from collecting any further refund for report year 2008. (1.Supp.RR.8-9). The Comptroller agreed it would not do so, and agreed that CGG would be entitled to seek an additional refund if it prevails on the apportionment claims. (1.Supp.RR.26-30).

---

[3] "Apportionment" refers to the method by which CGG's tax base is divided between Texas and locations outside of Texas. Tex. Tax Code § 171.103. "Because all of a company's . . . taxable margin may not be attributable to business done in Texas, receipts must be apportioned between Texas and other jurisdictions. The tax code does this by multiplying an entity's . . . taxable margin . . . by a fraction, the numerator of which consists of receipts from business done in Texas, . . . and the denominator of which consists of all receipts from business anywhere, including Texas." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 437 (Tex. 2011).

17

**F.      The Trial Court Entered a Final Judgment and Made Findings and Conclusions in Favor of CGG.**

The trial court entered a final judgment (1) concluding that CGG "is entitled to claim a [COGS] deduction in the amount of $567,600,223" for report year 2008; (2) incorporating the parties' stipulation on the R&D credit amount; and ordering that (3) CGG's tax due[4] was $1,721,022.23; (4) the Comptroller shall issue an appropriate refund check with interest; and (5) CGG shall not be barred from seeking an additional refund upon final disposition of its apportionment claims. (CR.250-51).

The trial court also issued findings of fact (FOF) and conclusions of law (COL) in support of the judgment. (CR.265-270). These findings and conclusions confirm that CGG qualifies for the COGS deduction under Section 171.1012(i), and that all of the costs included in its COGS calculation were allowed by Sections 171.1012(c), (d), and (f). (CR.265-270).

---

[4]      The "tax due" amount (line 30) was calculated using the higher apportionment factor, which CGG disputes via its administrative claims.

## SUMMARY OF THE ARGUMENT

The trial court correctly determined that CGG is entitled to claim a $567 million cost of goods sold (COGS) deduction in calculating its 2008 franchise taxes. Under the plain language of Texas Tax Code Section 171.1012, CGG qualifies to claim the COGS deduction because it is the actual and/or deemed owner of goods (per subsection (i)), and CGG incurred costs within the categories allowed for deduction (per subsections (c), (d), and (f)). The Comptroller, who raises only a couple of legal sufficiency complaints, has not demonstrated a complete absence of evidence to support any of the trial court's findings. The Comptroller also has not proven that any of the court's conclusions (which are fully supported by the underlying facts) are legally wrong. The judgment should be affirmed.

The Comptroller's analysis, which begins by looking at the specific costs deducted, is convoluted. The threshold question is taxpayer eligibility. Once it is determined that a taxpayer qualifies as either an actual or deemed owner of goods to calculate its "margin" using the COGS deduction, then the taxpayer calculates the amount of its deduction by summing together all of the costs allowed by Section 171.1012.

To qualify as a "deemed owner," a taxpayer need not actually own or sell "goods" as defined by Section 171.1012(a). Thus, the meaning of

19

"tangible personal property" is irrelevant to this analysis. Instead, a taxpayer who "furnishes labor or materials" to projects for the construction or improvement of real property is "considered to be the owner of that labor or materials," which provides an alternative way to qualify for the COGS deduction.  CGG satisfies this test under the analysis set forth in *Combs v. Newpark*, 422 S.W.3d 46, 49 (Tex. App.—Austin 2013, no pet.).   In regard to both its proprietary and MCDL customers, CGG exerts physical and mental effort to acquire and produce seismic data, which is a critically important part of oil and gas drilling/production projects.  The Comptroller's contrary arguments (1) improperly conflate qualifying "activities" with allowable "costs," and (2) construe *Newpark* in an overly-narrow manner based on the same principals underlying the Comptroller's previously-rejected theory that a taxpayer must "effect a physical change" to the property.

To qualify as an "actual owner," the taxpayer must actually own goods based on traditional incidents of ownership.  It is undisputed that CGG owns the seismic data that it sells through the multi-client data library (MCDL).  This data, although otherwise considered "intangible" for sales tax and apportionment purposes, is specially treated as "tangible personal property" exclusively for purposes of the COGS deduction.   Thus, it satisfies the

definition of "goods" under Section 171.1012(a)(3)(A)(ii).  The Comptroller's argument is fundamentally flawed because it fails to appreciate the difference in treatment of this unique type of intellectual property for purposes of the COGS deduction, and his interpretation of the relevant definition is overly narrow.

Because CGG qualifies under subsection (i) as an actual and/or deemed owner, CGG is entitled to deduct all of its incurred costs allowed by the categories listed in subsections (c), (d), and (f).  For report year 2008, this amount totaled $567 million, which was calculated for CGG's entire business as a combined group pursuant to the analysis set forth by this Court in *Newpark*, 422 S.W.3d at 52.  At trial, the Comptroller challenged only whether CGG qualified for the COGS deduction and preserved no complaint about the specific costs to be included in the calculation.  In any event, CGG's calculation is legally correct and supported by sufficient evidence.

Section 171.1012 is not ambiguous. *Newpark*, 422 S.W.3d at 56 n.9 Hence, there is no need to defer to the Comptroller's contrary litigating position nor to add words or requirements into the statute that our Legislature did not intend.   Moreover, the COGS deduction should be construed strictly against the Comptroller because it is akin to an "exclusion" rather than an "exemption" from tax.

## STANDARDS OF REVIEW

### I.   STATUTORY CONSTRUCTION.

"The issues in this case primarily concern the proper construction of chapter 171 of the Tax Code." *Newpark*, 422 S.W.3d at 49. Statutory construction is a question of law reviewed de novo. *Id.* The primary objective is to ascertain and give effect to the legislature's intent by first considering the statute's plain language. *Id.* Courts should reject any attempt to read words or requirements into the statute that were not intended by our Legislature. *See Zimmer US, Inc. v. Combs*, 368 S.W.3d 579, 587 (Tex. App.—Austin 2012, no pet.). "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *Greater Houston P'ship v. Paxton*, No. 13-0745, 2015 WL 3978138, *5 (Tex. June 26, 2015) (quoting *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)).

If the statutory text is unambiguous, then "it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would produce an absurd result." *Newpark*, 422 S.W.3d at 49. "Only when the statutory text is ambiguous 'do we resort to rules of construction or extrinsic aids.'" *Id.* (internal citations omitted).

Finally, "statutory determinations in tax disputes should reflect the economic realities of the transactions in issue." *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013). "And '[t]axing statutes are construed strictly against the taxing authority and liberally for the taxpayer." *Am. Multi-Cinema, Inc. v. Hegar*, No. 03-14-00397-CV, --S.W.3d --, 2015 WL 1967877, *3 (Tex. App.—Austin Apr. 30, 2015, no. pet. h.) .

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW.

The trial court entered findings of fact and conclusions of law in support of the judgment. (CR.265-270). The Comptroller specifically challenges: FOF.12-13 (*Appellants' Brief*, p.37-38: arguing findings are irrelevant and supported by no evidence); COL.1, 2, 4, 5, 7 (*id.* p.29, 36, 42: arguing conclusions are legally incorrect).[5]

"[F]indings of fact [are reviewed] for legal and factual sufficiency of the evidence by the same standard applied to a jury verdict." *Am. Multi-Cinema*, 2015 WL 1967877, at *4. "When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex.

---

[5] The Comptroller also claims Finding 7 is "irrelevant" but otherwise concedes its accuracy. *Id.*, p.29-30, 42, 49 n.10. Despite the Comptroller's failure to specifically challenge Conclusions 8, 9, and 11, CGG interprets such a challenge to be within the scope of the Comptroller's argument.

23

2014). The court must credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* "The trial court, acting as factfinder, is the sole judge of credibility of the witnesses and weight to be given to their testimony." *Newpark*, 422 S.W.3d at 49.

"[C]onclusions of law [are reviewed] de novo to determine their correctness." *Am. Multi-Cinema*, 2015 WL 1967877, at \*4. But even an erroneous conclusion will not support reversal if the trial court rendered the proper judgment. *Id.*; *see also Vinson v. Brown*, 80 S.W.3d 221, 230 (Tex. App.—Austin 2002, no pet.).

Unchallenged fact findings are "binding on the appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The court must disregard all contrary evidence and, if there is any remaining evidence in support of the finding, it must be upheld; and if that finding is sufficient to support the judgment, it should be affirmed. *Id.*; *see also DPRS 15th St., Inc. v. Texas Skyline, Ltd.*, No. 03-11-00101-CV, 2014 WL 4058796, \*5-6 (Tex. App.—Austin Aug. 13, 2014, no pet.); *Murray v. Grayum*, No. 03-10-00165-CV, 2011 WL 2533796, \*5 (Tex. App.—Austin June 24, 2011, pet. denied).

# **ARGUMENT**

The trial court properly determined that CGG qualifies for the COGS deduction as an actual or deemed owner of goods, and that CGG is entitled to deduct $567 million in COGS as a result. By allowing CGG to deduct its costs and arrive at a tax on net profits, the judgment comports with the overall goal of the franchise tax: to tax a business's margin.

This Court should reject the Comptroller's arguments because they arise from a misunderstanding of how Section 171.1012 operates, ignore ample evidence in the record to support the trial court's conclusions, and ask this Court to read requirements into the statutory text not intended by our Legislature. The final judgment appropriately interprets and applies Section 171.1012 to CGG's business. It should be affirmed in full.

## I.    FRANCHISE (MARGIN) TAX CALCULATION.

The franchise tax is a tax on the privilege of doing business in Texas. *TGS-NOPEC*, 340 S.W.3d 437. As amended in 2006, the tax is specifically designed to be imposed on a business's margin, not on its revenue, net worth, or earned surplus. *Id.*; *see also In re Nestle USA, Inc.*, 387 S.W.3d 610, 614, 622 (Tex. 2012). Margin is akin to net profits. *See* Tex. Tax Code § 171.101. To effectuate this purpose, the statute provides that every method

25

of calculating one's franchise tax shall benefit from specified reductions to the taxpayer's total revenue, as discussed below.  (*See* 2.RR.41; 3.RR.68).[6]

"[T]he first step for all taxable entities and all methods of computing taxable margin is to calculate the taxpayer's 'total revenue.'" *Titan Transp., LP v. Combs*, 433 S.W.3d 625, 628 (Tex. App.—Austin 2014, pet. denied); Tex. Tax Code § 171.1011 (a)-(d).  Taxpayers determine total revenue by subtracting statutory exclusions from the gross income reported on federal income tax returns.  *Id.* §§ 171.1011(e)-(g)(11), (k), (m)-(n), (q)-(r), (u)-(x).

"After calculating total revenue, taxpayers may then employ the method of determining taxable margin that produces the lowest franchise-tax obligation." *Titan*, 433 S.W.3d at 628; Tex. Tax Code § 171.101 (a).  For report year 2008, the code offered three calculations using a specific deduction from revenue plus additional credits: (1) the cost of goods sold (COGS) deduction under Section 171.1012; (2) the compensation deduction under Section 171.1013; and (3) the 70% ceiling/30% default deduction under Section 171.101 (a)(1)(A). *Titan*, 433 S.W.3d at 628-29; *Newpark*, 422 S.W.3d at 47-48. [7]

---

[6]    The Tax Code provisions applicable to this case are those in effect on January 1, 2008.  For convenience, the citations herein are to the current version of the code unless specified to indicate a substantive change between the 2008 and the current version.

[7]    In 2008, there was also a "short form" calculation known as the "E-Z method," providing a lower tax rate in lieu of any deductions and credits under Section 171.1016.

The total tax due is calculated as follows (with corresponding references to the 2008 franchise tax report, *see* 4.RR.P.Ex.1):

Total Revenue (calculated with applicable exclusions), *items 1-10*
— Deduction (1 of 3 methods), *items 11-21*
**= Margin**, *item 22*

Margin
x Apportionment factor, *items 23-25*
**= Apportioned margin**, *item 26*

Apportioned margin
— Other allowable deductions, *item 27*
**= Taxable margin**, *item 28*

Taxable margin
*x Tax rate (typically 1%; sometimes 0.5%), item 29*
**= Tax due**, *item 30*

Tax due
— Tax credits, *item 31*
— Discount, *item 33*
**= Total Franchise Tax Due**, *item 34*

*In re Nestle*, 387 S.W.3d at 614-616; *Titan*, 433 S.W.3d at 627-28. Because there is always some deduction from revenue, the resulting tax is one imposed on an entity's *margin*, not its revenue. *See* Tex. Tax Code § 171.1014(d).

---

"Effective January 1, 2014, taxpayers not using the E-Z computation method [] also have the option to deduct a flat $1 million from total revenue if that sum is greater than the COGS, compensation, or 30% deductions." *Titan*, 433 S.W.3d at 628.

## II. THE COGS DEDUCTION, SECTION 171.1012.

The only relevant calculation method in this suit is the COGS deduction. The Comptroller's analysis of Section 171.1012 is improperly inverted. The Comptroller argues that the Court should first determine whether CGG has any allowable costs to deduct as costs of goods sold (COGS) and then determine whether CGG qualifies for the deduction. *See Appellants' Brief*, p.21, 25.

"That defies the logic of the statute." (3.RR.155). The threshold inquiry is whether the taxpayer qualifies under Section 171.1012(i) to claim the COGS deduction. Once the taxpayer crosses that threshold test, the taxpayer is entitled to calculate its COGS deduction by including all the costs it incurred that are classified as allowable costs under subsections (c), (d), and (f).

### A. Does the Taxpayer Qualify for the COGS Deduction?

Section 171.1012(i) begins by stating that "A taxable entity may make a subtraction under this section in relation to the cost of goods sold [*i.e.* qualify to claim the COGS deduction] only if that entity owns the goods." Tex. Tax Code § 171.1012(i). A taxpayer can satisfy this test by being either an "actual" or "deemed" owner of goods. *Id*. As discussed in more detail below, these two terms mean:

- **Actual owner**: a taxpayer who is the "owner of goods . . . based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxable entity." *Id*. § 171.1012(i), *second sentence*; *see also* 34 Tex. Admin. Code § 3.588(c)(8) (same).

- **Deemed owner:** a taxpayer who "furnish[es] labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance . . . of real property." Tex. Tax Code § 171.1012(i), *third sentence; see also* 34 Tex. Admin. Code § 3.588(c)(8)(A)-(B) (same).[8]

The Comptroller devotes much of his argument to whether CGG's seismic data satisfies the meaning of "goods," as defined for purposes of COGS to include certain types of "tangible personal property." *See* Tex. Tax. Code § 171.1012(a)(1), (3). These terms are relevant only to whether a taxpayer is an "actual owner." The Comptroller's argument about "tangible" property ignores the statute's alternate provision entitling a taxpayer to qualify as a "deemed owner." CGG first addresses the deemed owner provision, and then turns to the actual owner provision along with the proper interpretation of goods or "tangible personal property" for purposes of the COGS deduction.

---

[8]    The last sentence of Section 171.1012(i) provides another way to qualify as a "deemed owner," which is not relevant here: "a taxable entity shall be treated as the owner of goods being manufactured or produced by the entity under a contract with the federal government. . . ." *Id*. Other subsections allow certain types of taxpayers to take the COGS deduction even if they are not "actual owners" of goods. *See id*. § 171.1012(k-1) (regarding three types of rental or leasing companies), (k-2) (regarding pipeline entities who own or lease and operate pipelines transporting product they do not own).

29

**B.    What Costs are Allowed for the COGS Deduction?**

Once a taxpayer crosses the threshold qualification for the COGS deduction (as either an actual or deemed owner of goods), the statute directs the taxpayer to calculate the dollar amount of its deduction by adding all of the costs it incurred under the categories allowed by subsections (c), (d), and (f).  *See* Tex. Tax Code § 171.1012(i), *first sentence* (actual and deemed owners "may make a subtraction [of costs allowed] <u>under this section</u>"); *third sentence* (confirming deemed owners may "include the costs, <u>as allowed by this section</u>, in the computation of [COGS]") (emphasis added); *id.* §§ 171.1012(c), (d), (f).  *Infra*, Argument IV.

The costs allowed "by or under this section" include "all direct costs of acquiring or producing the goods," and "up to 4% of its indirect or administrative overhead costs—such as legal, security, and accounting services—provided that it can demonstrate those costs 'are allocable to the acquisition or production of goods.'" *Newpark*, 422 S.W.3d at 53.

## III.    CGG QUALIFIES FOR THE COGS DEDUCTION.

CGG qualifies for the COGS deduction as a "deemed owner" based on its proprietary and/or MCDL business activities.   If this Court agrees, then the judgment should be affirmed regardless of whether CGG's seismic images satisfy the definition of "goods" under Section 171.1012(a)(3)(A)(ii).

However, even if CGG were not a "deemed owner," CGG would qualify as an "actual owner of goods" based on its MCDL business activity.  This provides an alternative basis for affirming the final judgment in full.

### A.    CGG Qualifies as a "Deemed Owner."

Under the third sentence of Section 171.1012(i), a taxpayer qualifies as a "deemed owner" if it "furnish[es] labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance . . . of real property."  Tex. Tax Code § 171.1012(i).  A taxpayer engaged in such activity "is considered to be an owner of that labor or materials and may include the costs, as allowed by this section, in the computation of cost of goods sold."  *Id.*; *see also* 34 Tex. Admin. Code § 3.588(c)(8)(A)-(B) (same).

The Comptroller agrees with the concept of "deemed ownership" but disputes whether CGG's activities qualify.  *Appellants' Brief*, p.5, 44-45, 50.[9]  As discussed below, CGG satisfies both elements of the deemed-owner test because (1) it furnishes labor or materials (2) in a manner that is sufficiently-connected to a real-property improvement project.

The deemed owner provision applies when a taxpayer does not actually own and sell "goods" as defined by subsection (a).  The "labor or materials" furnished by the taxpayer is substituted in lieu of "ownership of goods."   In

---

[9]    The Comptroller also disputes what costs are allowed for deduction upon qualifying as a deemed owner.  We address this issue separately.  *Infra*, Argument IV.

31

*Newpark*, this Court recognized that the third sentence of subsection (i) would be rendered "meaningless" if the taxpayer had to actually own or sell goods to qualify for the COGS deduction as a deemed owner. *Id.* at 55.

As an initial matter, the Comptroller did not challenge Findings of Fact 8 and 9, which specifically state that CGG "furnishes labor" and "furnishes materials." (CR.266). Nor did the Comptroller challenge Findings 2-4, which provide additional detail about the nature of CGG's work, nor Findings 5-7 and 10, which confirm that CGG's labor and materials are furnished for the purpose of oil and gas exploration and production. (CR.265-66). Relatedly, the Comptroller does not challenge Conclusion of Law 3, stating that "[o]il and gas wells constitute real property for purposes of [Section] 171.1012(i)." (CR.268). The unchallenged findings are binding on the Court because there is evidence in the record to support them, as described below. The judgment should be affirmed because Conclusions of Law 1 and 4 (concluding that CGG is eligible for the COGS deduction as a deemed owner) stand on the basis of these findings. *Supra*, Standard of Review II.

### 1. *CGG furnishes labor and materials.*

The first element to qualify as a deemed owner is that the taxpayer "furnish labor or materials." Tex. Tax Code § 171.1012(i). A taxpayer is not

required to furnish both labor and materials to qualify as a deemed owner; either will suffice. *Id.* However, CGG furnishes both, and the judgment can be affirmed on either ground standing alone.

a. Labor.

Section 171.1012 does not define "labor." This Court addressed the meaning of that term in *Newpark*, 422 S.W.3d at 56, which likewise involved a taxpayer's activities related to the production of oil and gas. "'Labor' is a broad term that encompasses a wide range of activities, including 'expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory.'" *Newpark*, 422 S.W.3d at 56 (quoting Webster's Third New International Dictionary 1259, 2075 (Phillip Gove Ed. 2002)). Because nothing in the statutory text indicates that "labor" for purposes of the COGS deduction has "a more limited meaning than its common definition," this Court "presume[d] that the legislature intended to allow taxable entities to deduct a wide range of labor expenses." *Id.* Under this definition, the post-drilling "transport and disposal of [] used drilling mud and other waste material" qualified as "labor." *Id.* at 55, 57.

Just as in *Newpark*, CGG's acquisition and production of seismic data and images satisfies the meaning of "labor" under Section 171.1012(i). As detailed in Statement of Facts I.A, CGG employs large crews to create sound

33

waves using specialized materials and equipment. CGG's workers travel to and spend a considerable amount of time at the physical locations where their customers intend to construct wells for the production of oil and gas. The work required to acquire seismic data on these project sites is intense and requires specialized skills, such as drilling holes, blasting large swaths of dynamite, driving thousands of geophones into the earth, shaking the earth with a series of 60,000 to 90,000 pound vibrating trucks, and/or shooting an array of large airguns into the sea and through the ocean floor to create seismic sound waves. The second step of producing or processing seismic data likewise requires a hefty expenditure of effort, albeit more mental than physical. Here, highly-trained workers apply complicated algorithms and geophysical concepts, using specialized hardware and software. In total, this requires several months to several years of work.

CGG's activities constitute the "expenditure of physical or mental effort." The efforts regarding both the acquisition of data and production of seismic images are difficult, fatiguing, and require specialized skills. Thus, CGG's activities satisfy the meaning of "labor" under Section 171.1012(i).

b. <u>Materials.</u>

The meaning of "materials" is not defined by Section 171.1012, was not at issue in *Newpark*, and has not otherwise been addressed by any appellate

34

court in the context of the COGS provision. As with "labor," nothing in the statutory text indicates an intention for the term "materials" to have any narrower of a meaning than its common definition. *See* Tex. Tax Code § 171.1012(i). The common meaning of "material" is "elements, constituents, or substances of which something is composed or can be made." Merriam-Webster's Collegiate Dictionary 765 (11th ed. 2012). The definition also includes, "something (as data) that may be worked into a more finished form." *Id.*

CGG furnishes materials in the form of dynamite, geophones, airguns, cables, trucks, batteries, and other miscellaneous parts used to create sound waves for the acquisition of seismic data, as well as the ultimate seismic data or images provided for use in the exploration and production of oil and gas. *Supra*, Statement of Facts I.A. These items satisfy the common meaning of materials as used in Section 171.1012(i).

> c. <u>The Comptroller's categorical attempt to separate "labor and materials" from "geological and geophysical" work misinterprets the statute.</u>

The Comptroller attempts to categorically dismiss the labor and materials furnished by CGG with a contrived argument that CGG's activity cannot be "labor or materials" because subsection (c) contains separate provisions for "geological and geophysical costs" versus "labor" and

35

"material" costs. *Appellants' Brief*, p.45-49. This argument fails for multiple reasons.

Section 171.1012(c) provides in relevant part:

> The cost of goods sold includes all direct costs of acquiring or producing the goods, including:
>
> (1)    labor costs;
>
> (2)    cost of materials that are an integral part of specific property produced;
>
> (3)    cost of materials that are consumed in the ordinary course of performing production activities; . . . [and]
>
> (10)    geological and geophysical costs incurred to identify and locate property that has the potential to produce minerals.

Tex. Tax Code § 171.1012(c).

As an initial matter, the Comptroller claims—without any citation to the record—that the trial court "reject[ed]" CGG's "argument that it was entitled to a COGS deduction under § 171.1012(c)(10)." *Id.*, p.45. This represents a factual misunderstanding of what happened at trial, and it relates to the Comptroller's legal misunderstanding of how Section 171.1012 operates. *Infra*, Arguments II, IV. CGG did not argue that it "qualifies" for the COGS deduction on the basis of subsection (c)(10). Rather, it claimed that having qualified for the deduction as an actual or deemed owner under

subsection (i), it is entitled to deduct all of its incurred costs as allowed by subsections (c), (d), and (f), including the costs specified under (c)(10). (2.RR.41-43; 3.RR.103, 155-56; CR.84).

The record conclusively demonstrates that the trial court accepted CGG's argument that it was entitled to deduct the costs it incurred under subsection (c)(10) and all other subcategories of CGG's proven costs. CGG's tax director (Listya Diyah) testified about the costs incurred by CGG under subsection (c)(10), and two exhibits provide a breakdown of these costs. (3.RR.55-56; 4.RR.P.Ex.19, 48). This was sufficient evidence for the trial court to find that CGG's calculation included approximately $674 million[10] in subsection (c) costs (the total shown on CGG's exhibits, including the full amount of its (c)(10) costs), and to conclude that "[e]ach of the costs that CGG included in its [COGS] deduction were allowed by [subsections] (c), (d), and (f)," and that "CGG is entitled to claim [the total amount of its COGS deduction] for Report Year 2008." (CR.267-68 at FOF.15, COL.8-9). The trial court could not have made these determinations if it "rejected" CGG's ability to include the (c)(10) costs in its COGS deduction. Moreover, Finding

---

[10] The amount of subsection (c) costs is higher than CGG's total COGS amount of $567 million because the total calculation includes approximately $1.2 million in intra-group eliminations, per the combined-reporting rules under Section 171.1014. (CR.267 at FOF.15(d)).

15 is binding on this Court because the Comptroller has not raised a sufficiency challenge to it, and it is supported by the record.

The Comptroller's categorical argument also misinterprets the statutory text by conflating a description of *activities* with the *costs* incurred to perform certain activities. *See Appellants' Brief*, p.46. Subsection (i) refers to the activities required for a taxpayer to qualify as a deemed owner of goods: furnish labor or materials. Tex. Tax Code § 171.1012(i). As discussed above, the statute does not limit the meaning of "labor" or "materials" beyond their broad, common definitions. Subsection (c) describes thirteen categories of direct costs that may be deducted by a taxpayer who qualifies under subsection (i). *Id*. § 171.1012(c).

Notably, this list is written in inclusive rather than exclusive terms. "'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." *Sneed v. Webre*, No. 12-0045, 2015 WL 3451653, *14 (Tex. May 29, 2015) (citing Tex. Gov't Code § 311.005(13)). The list begins by identifying broad categories, such as the descriptions of general labor and material costs in (c)(1)-(3), and then delineates more industry-specific costs such as those in (c)(10). That does not mean a taxpayer who deducts costs under (c)(10) is prohibited from also

deducting costs under (c)(1)-(3). Instead, all categories are "included" as examples of the types of direct costs allowed for deduction by qualifying taxpayers. Subsection (c)(10) is not rendered meaningless by this interpretation.

This broad allowance of deductible *costs* does not limit the meaning of the underlying *activities*. Just because a taxpayer incurs costs "to identify and locate property that has the potential to produce minerals" does not prohibit a conclusion that the taxpayer has also "furnished labor and materials." It would be illogical to conclude that a taxpayer who performs "geological and geophysical" work never "furnishes labor or materials" as part of that work. Stated another way, the activity of performing "geological and geophysical work" is not mutually exclusive of "furnishing labor or materials," and vice-versa.

To the contrary, the statute's express allowance of deductions for oilfield related costs, such as intangible drilling costs and geological and geophysical costs informs the court of the types of activities contemplated as those eligible for COGS. Under the Comptroller's analysis, oil and gas drilling contractors would not be eligible to claim COGS for the reason that their costs include, by and large, intangible drilling costs, which the statute expressly allows under subsection (c)(7).

39

d. The Comptroller's argument that CGG's work is a "service" that is not "fatiguing, difficult, or compulsory" enough to constitute "labor" is an improper recast of its previously-rejected "physical change" theory.

The Comptroller next argues that CGG's work does not constitute "labor" because it is a "service" that is "sophisticated—not fatiguing, difficult, or compulsory." *Appellants' Brief*, p.47. This argument misreads *Newpark*, ignores evidence in the record, and is merely a repackaged version of the Comptroller's prior "physical change" argument, which has been twice rejected by this Court and publically-abandoned by the Comptroller.

As here, the Comptroller argued in *Newpark* that NES's transport and disposal of used drilling waste were "clearly a service and not labor supplied for the improvement of real property." 422 S.W.3d at 56-57. This Court rejected the argument, holding that that the meanings of "service" and "labor" are not "mutually exclusive," and "the[ir] ordinary definitions . . . substantially overlap such that both definitions tend to refer to the words interchangeably." *Id.* at 54. Notably too, certain "service" costs are expressly allowed for deduction under subsection (f), showing the Legislature's intent that aspects of "service" can be provided as part of "furnishing labor or materials." Tex. Tax Code § 171.1012(f); (3.RR.73, acknowledged by auditor Dullum). Hence, although an activity may have attributes of "service," that

40

does not holistically prevent it from constituting "labor." CGG's activity qualifies as labor just as NES's did.

Moreover, *Newpark* does not hold that a taxpayer's activities are absolutely required to be "fatiguing, difficult, or compulsory" to satisfy the meaning of "labor." *Newpark* holds that it will be "especially" clear that a taxpayer's efforts qualify as labor where any one of those (or presumably similar) characteristics are present. 422 S.W.3d at 56. *Newpark* also holds that "mental" effort can satisfy the definition of labor—it does not have to be physical effort. *Id.* Granted, at some point, activities become "too far removed" from a real-property construction project to qualify under Section 171.1012(i). *Infra*, Argument III.A.2. Nevertheless, *Newpark* does not create a bright-line test that efforts must be "physical," nor that they must be "fatiguing, difficult, or compulsory" to qualify. In any event, the record demonstrates that CGG's activities satisfy the definition as described in *Newpark*. *Supra*, Argument III.A.1.

At trial, the Comptroller's auditor, Gary Dullum, testified that the only reason he denied CGG the COGS deduction was because he considered CGG a "service provider" rather than the actual driller/producer of minerals. (3.RR.84-85). Dullum's misunderstanding apparently arose from the Comptroller's training that, to qualify for the COGS deduction as a "deemed

41

owner" of goods under Section 171.1012(i), a taxpayer must "physically work [on] and effect a change" to real property. (3.RR.88-89).

The Comptroller's corporate representative, Sarah Pai, confirmed it was the agency's "litigation position and . . . policy . . . that an entity must physically work on and effect a change to real property in order to be entitled to take the [COGS] deduction available under 171.1012(i)." (4.RR.P.Ex.46, p.31). She also confirmed that the <u>only</u> reason the Comptroller concluded CGG does not qualify as a deemed owner under Section 171.1012(i) is "because [CGG is] not physically working on the property and making a change." (*Id.*, p.46). She acknowledged that CGG is "physically present on the property and they're working," but claimed the "element they fail is that work does not effect a physical change." (*Id.*, p.174; *see also* 2.RR.64; CR.61-62).

After trial, the Comptroller publically-abandoned its "physical change" argument in recognition of the fact that this Court has repeatedly rejected it. In a June 2014 memorandum, the Comptroller's office stated:

> Based on the [Third Court's] language and analysis in TITAN and NEWPARK, we are revising the policy with regard to subcontracting payments eligible for . . . deduction under Section 171.1012(i). . . .[11]

---

[11] Although this memorandum changed the Comptroller's internal policy, it did not establish a formal rule in the absence of public notice and comment. *See* Tex. Gov't Code Ch. 2001 (Administrative Procedure Act regarding notice and comment rulemaking).

> [W]e are <u>expanding</u> the interpretation of what is considered to be furnishing labor or materials to a [real property project] . . . and <u>will no longer require an entity to actually physically touch the property or make a change to the property to qualify for the COGS deduction</u>. . . .

Texas Comptroller of Public Accounts, *Memorandum from Tax Policy Division*, 201406920L (June 10, 2014) (STAR document available at http://cpastar2.cpa.state.tx.us/index.html) (emphasis added).  This "change has immediate effect and a taxable entity may file an amended franchise tax report for years that are open within the statute of limitations."  *Id.*  Thus, the change has retroactive application and must be applied to CGG in this case.

Despite this announcement, the Comptroller's Brief returns to the same theory and underlying principles of the "physical change" argument, and simply recasts them as CGG's activities being too "sophisticated" and "service" oriented, and not physically demanding ("fatiguing, difficult, or compulsory") enough to be considered "labor."  *See Appellants' Brief*, p. 25-26, 28-32, 47.  Ultimately, this is the same argument, and it fails for the same reason: None of these requirements are contained within the plain statutory text requiring the taxpayer to "furnish labor or materials."  If the Legislature wished to limit the provision to entities actually performing construction or

43

other physical labor or affecting a physical change onsite, it would have left out the words "or materials" and "to a project," which expand the scope of the provision.

Moreover, Section 171.1012(i) explicitly applies to entities furnishing labor or materials to a project for the *industrial maintenance* of real property, which is outside the scope of normal activity for a "construction company" and often would not result in any physical change to the property. Auditor Dullum admitted this. (3.RR.75).

> e. The Comptroller's two-sentence argument regarding "materials" is unavailing.

Beyond the Comptroller's attempt to categorically dismiss CGG's "furnishing of labor or materials," his only argument for why CGG does not furnish materials is confined to two sentences without supporting legal or factual analysis. *Appellants' Brief*, p.47. The Comptroller argues that CGG's seismic data is not "consumed" in the drilling process. *Id.* To any extent this argument has been adequately briefed for preservation under Texas Rule of Appellate Procedure 38.1(i), it fails.

The Comptroller overlooks many of the other materials furnished by CGG beyond its seismic data, and the Comptroller utilizes an overly-narrow definition of "materials." *Supra*, Argument III.A.1.b. The Comptroller relies on Section 171.1012(c)(3), which allows deductions for the "cost of materials

44

consumed in the ordinary course of performing production activities."  To any extent this cost category describes one type of material that could be *furnished* under subsection (i), it does not do so exclusively.  The meaning of "materials furnished" is broader than the specific categories of material costs that can be deducted.  Moreover, our supreme court has held that "consumption" of materials is not required to establish that they were "furnished" for purposes of a materialman's lien.  *Houston Fire & Cas. Ins. Co. v. Hales*, 279 S.W.2d 389, 392 (Tex. Civ. App.—Eastland 1955, writ ref'd n.r.e.) (citing *W. L. MacAtee & Sons v. House*, 153 S.W.2d 460 (Comm'n of App. adopted by Sup.Ct.)).

### 2. *CGG's activities are sufficiently connected to a real-property improvement project.*

To qualify for the COGS deduction as a deemed owner, the labor or materials furnished by the taxpayer must be "to a project for the construction, improvement, [etc.] of real property."  Tex. Tax Code § 171.1012(i).  "It is undisputed that the drilling and construction of oil and gas wells qualifies as construction or improvement to real property."  *Newpark,* 422 S.W.3d at 55; (*see also* 4.RR.P.Ex.46, p.115).  Thus, the only question is whether CGG's activities are sufficiently connected to projects for the drilling and construction of oil and gas wells.

45

In *Newpark*, this Court did not create a bright-line test. Instead, it held that satisfaction of this standard must be on a case-by-case basis. *Id.* at 56-57. There, the Court held that NES's waste-disposal activity qualified based on three considerations. One, "it is difficult to view [the activity] as though it were not an essential and direct component of the drilling process." *Id.* at 56. Two, the Legislature indicated that such activity should qualify by allowing deduction of "similar costs for scrap material and pollution control devices." *Id.* And three, the evidence demonstrated that drilling activity could not continue without the waste removal and disposal activities provided by NES. *Id.*

CGG's activity is likewise sufficiently connected to oil and gas drilling projects. In light of the uncontroverted testimony of Bob Montgomery and the contractual agreements stating that CGG's acquisition and production of seismic data is an integral part of the customer's drilling business, and considering the millions of dollars E&P companies are willing to pay for this critical work, it is difficult to view CGG's activity as though it were not an essential and direct component of the drilling process. *Supra*, Statement of Facts I.B.

Second, the Legislature indicated that such activity should qualify by specifically allowing deduction of "geological and geophysical costs incurred

46

to locate property that has potential to produce minerals." *See* Tex. Tax Code § 171.1012(c)(10). Contrary to the Comptroller's argument, this category of costs expands upon rather than limits the type of labor and materials that should qualify under subsection (i). *Supra*, Arguments III.A.1.c, IV.B.

Third, the record demonstrates that drilling activity could not commence—or at least not do so successfully or in a manner that efficiently locates all producible mineral reserves—without the seismic data "blueprint" furnished by CGG. *Supra*, Statement of Facts I.B. These considerations sufficiently support the trial court's conclusion that CGG furnishes labor or materials to a real-property construction or improvement project.

The Comptroller argues that CGG's activities are "too far removed" because its customer's drilling projects are only "potential" not "actual." *Appellants' Brief*, p.50-52. This argument reads words into the statute and ignores important evidence in the record. Nothing in the statute specifies the status of when a project "officially" begins, nor does the statute definitively require that the labor or materials be furnished to only one project rather than several. *See* Tex. Gov't Code § 311.012(b) (In construing statutes, "[t]he singular includes the plural and the plural includes the singular.").

Before CGG begins working with a proprietary customer, the customer has already done a substantial amount of "macro geology" to identify the general location they want to drill and have established lease rights on that location to enable drilling once the minerals are located by CGG's seismic data. *Supra*, Statement of Facts I.C. Moreover, the customer is far enough into the project to specify the parameters of work for CGG, and they remain actively involved with CGG throughout the timeline of its work. *Id*. Sometimes a customer has gone so far as to obtain initial seismic data for CGG to process. This is sufficient evidence from which the trial court could conclude that CGG furnishes labor and materials "to a project."

In regard to CGG's MCDL customers, CGG does not begin the process of acquiring and producing seismic data in any location unless it is "hot" with interest by several E&P companies to drill there. *Supra*, Statement of Facts I.D. It would be far too costly of CGG to do otherwise. (*See* 5.RR.D.Ex.14, p.23-24: stating CGG's policy of generally requiring a certain number of "pre-commitments" from customers before beginning the acquisition of MCDL data). Thus, at a minimum, the MCDL data is acquired and produced "for a project" that is reasonably anticipated to occur. Sometimes, customers approach CGG to shoot a specific area, akin to a proprietary customer but with a trade-off of less cost for non-exclusive

rights. (3.RR.19; 5.RR.D.Ex.36, p.12). Moreover, by the time customers are able to buy licenses "off the shelf," they are presumably doing so for projects that are underway.

The Comptroller's arguments that CGG's seismic data does not qualify because it may indicate where not to drill, or because the drilling may not ultimately be successful, or because drilling may not occur in the same tax year, are all red herrings. Determining where to drill and not to drill are equally essential components of the project. Just because a customer may review the seismic map and decide to not drill in location A, but to instead drill in location B, or to avoid a dangerous blowout and not drill at all, does not mean CGG failed to furnish labor or materials "to a project." Furthermore, nothing in the statute requires that a taxpayer maintain books and records that would somehow trace and parse its costs by the dates and ultimate successes of the customers' drilling projects. Such an argument ignores the economic realities of business in direct contravention to the Texas Supreme Court's holding in *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013).

In *Newpark* the Comptroller vehemently argued NES's activities were nothing more than that of a "garbage collector," which was clearly a service and not the furnishing of labor or materials to a project for the construction

or improvement of real property. 422 S.W.3d at 55-57. Now, the Comptroller argues the opposite, contending that NES's transporters "must rely heavily on human effort," and that "mov[ing] drilling mud toward or away from an existing project site" is a qualifying activity. *Appellants' Brief*, p.47, 51. Just as the Comptroller maintained an unreasonable argument for years against Newpark, the Comptroller does so here against CGG. CGG qualifies as a deemed owner for the COGS deduction just as NES/Newpark did, and the Comptroller's attempts to distinguish that case are unavailing.

## B. CGG Qualifies as an "Actual Owner."

Alternatively, CGG qualifies for the COGS deduction as an actual owner of goods (*i.e.,* an owner "based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxable entity"). *See* Tex. Tax Code § 171.1012(i), *second sentence*. Through its MCDL, CGG sells goods in the ordinary course of business.

### 1. *CGG owns and sells seismic data.*

There is no dispute that CGG owns the seismic data it licenses through its MCDL. (2.RR.123-24; 5.RR.D.Ex.36, p.13, 17, 19). The Comptroller also does not dispute that CGG's licensing of seismic data constitutes a "sale." *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 442 (Tex. 2011) (because the revenues from licensing seismic data derive from

conveyance and use of the underlying data, whereas the license itself is not a "revenue-producing asset," the transaction constitutes a "limited sale" of property)[12]; *see also Avis v. First Nat. Bank of Wichita Falls*, 174 S.W.2d 255, 258 (Tex. 1943) ("This Court has definitely declared that an oil and gas lease is the same as a sale of real estate.").

### 2. The seismic data is a "good" for purposes of the COGS deduction.

The only dispute regarding CGG's qualification as an "actual owner" is whether the products sold by CGG satisfy the relevant definition of "goods." *See Appellants' Brief*, p. 25-41. CGG qualifies because the seismic data that it intends to license for mass distribution without substantial alteration through its MCDL satisfies a unique definition of "goods" applicable only to the COGS deduction. *See id.* § 171.1012(a)(3)(A)(ii).

"Goods" are defined to mean "real or tangible personal property sold in the ordinary course of business of a taxable entity." Tex. Tax. Code § 171.1012(a)(1); *see also* 34 Tex. Admin. Code § 3.588(b)(3) (same). The legislature has defined three categories of property that shall be treated as "tangible personal property" exclusively for purposes of the COGS deduction:

---

[12] The tax issue involved in *TGS-NOPEC* was "apportionment." *See* Tex. Tax Code § 171.103. Although the nature of the transaction (*i.e.*, the licensing of seismic data) should be consistently construed as a "sale" of property for purposes of both the COGS deduction and apportionment, the nature of the property is treated differently for these two purposes, as explained below.

(a)    In this Section: . . .

(3)(A) "Tangible personal property" means:

(i)    personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner;

(ii)    films, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator or any one or more third parties in a form that is not substantially altered; and

(iii)    a computer program, as defined by Section 151.0031.

Tex. Tax Code § 171.1012(a)(3)(A)(i)-(iii); *see also* 34 Tex. Admin. Code § 3.588(b)(10)(A) (same).    By using the language "In this Section", the statute confined this specialized definition of '[t]angible personal property' to Section 171.1012.    In doing so, it excluded all other forms of (i) intangible property and (ii) services as being outside the definition of "goods" for purposes of the COGS deduction.    Tex. Tax Code § 171.1012(a)(3)(B); *see also* 34 Tex. Admin. Code § 3.588(b)(10)(B) (same).

The first category covers property that is traditionally thought of as "tangible": items that "can be seen, weighed, measured, felt," etc. Tex. Tax. Code § 171.1012(a)(3)(A)(i). Neither party argues that CGG's seismic data satisfies the first category.[13]

The second two categories cover property that is, in reality, "intangible" (*i.e.*, not of physical form). *Id.* § 171.1012(a)(3)(A)(ii)-(iii). Nevertheless, for the particular tax purpose of allowing a COGS deduction, our Legislature has chosen to specially define or treat these specific types of intangible property as "tangible personal property" (TPP). (*See* 3.RR.106). It is a legal fiction employed to serve a special purpose—the allowance of a deduction for high-cost industries important to the State that do not otherwise produce traditionally "tangible" products. As such, categories (ii) and (iii) constitute **"artificial TPP"** solely for purposes of the COGS deduction. *See TGS-NOPEC*, 340 S.W.3d at 443 & n.11 (noting that Texas legislature and other state legislatures are able to and have chosen to identify certain types of intangible property for specialized tax treatment).

---

[13]    Consequently, the outcome of this case is not controlled by *American Multi-Cinema, Inc. v. Hegar*, No. 03-14-00397-CV, --S.W.3d --, 2015 WL 1967877, *6 n.4 (Tex. App.—Austin Apr. 30, 2015, no. pet. h.).

**TPP for COGS is different than TPP for sales tax or apportionment.**

It is important to understand the distinctions between TPP as defined for purposes of (1) the COGS deduction versus (2) the Texas sales and use tax and (3) the franchise tax code's apportionment provision, which also employ the term "tangible personal property." *See* Tex. Tax Code § 151.009, § 171.103. The Comptroller overlooks these distinctions and improperly conflates authorities interpreting the relevant statutes.

This matters for two reasons. First, the authorities relied on by the Comptroller to characterize CGG's seismic data as "intangible" are based on sales tax or apportionment principles and, thus, do not control for purposes of the COGS deduction. *See Appellants' Brief*, p.32-34. Second, the Court should be aware of the implications of characterizing property as "tangible" or "intangible" under these various statutes. Generally speaking, sales of "tangible" personal property are subject to sales tax, and revenues from such sales are apportioned by the location of use for franchise tax purposes, while sales of "intangible" property are not subject to sales tax, and their revenues are apportioned by the location of payor. *See TGS-NOPEC Geophysical Co, v. Combs*, 340 S.W.3d 432 (Tex. 2011). Because CGG has pending administrative claims regarding its apportionment factor, the Court's discussion and holdings here should be limited to the treatment of CGG's

54

seismic data for purposes of the COGS deduction and not inadvertently result in an advisory opinion about its treatment for apportionment purposes.

The definitions of "goods" and "tangible personal property" in Section 171.1012(a) are expressly limited to application "in this section."  Comptroller representative Sarah Pai agreed that "in this section" as used in Section 171.1012(a) refers exclusively to the COGS provision and not to the franchise tax code generally.  (4.RR.P.Ex.46, p.120-21).  She unequivocally agreed that the phrase "in this section" "confine[s] the[] definitions [provided under Section 171.1012(a)] to Section 171.1012 and [they] don't extend into the apportionment rule."  (*Id.*, p.128).  On this basis, Pai further agreed that "if an item qualifies . . . as tangible personal property under (ii) of Section 171.1012[(a)(3)(A)], it is still correct to apportion that as an intangible, the sale of an intangible because the words 'in this section' confine the scope of those definitions to that Section 171.1012."  (*Id.*, p.128-29).

For purposes of sales tax, TPP is defined as "property that can be seen, weighed, measured, [etc.]" and "includes a computer program and a telephone prepaid calling card."  Tex. Tax Code § 151.009.  Thus, the definition overlaps with categories (i) and (iii) of TPP under the COGS

definition but notably leaves out category (ii), regarding the intellectual property at issue here.

The apportionment provision does not define TPP. *See* Tex. Tax Code § 171.103. However, the legislative history indicates a parallel treatment of TPP for purposes of sales tax and apportionment, distinct from the treatment of TPP for COGS purposes. The apportionment rules have remained largely unchanged since their amendment in 1997—a date when the Texas sales tax existed but vastly pre-dating the 2006 enactment of the current franchise tax. Because apportionment does not impact the calculation of one's tax base, no major changes were made to that provision when the Legislature adopted the margin/franchise tax.

Considering that (1) the COGS provision did not even exist until a decade after the current apportionment provision was enacted, (2) no relevant change was made to apportionment upon adoption of the COGS provision, and (3) the legislature expressly limited the definition of TPP for purposes of COGS—it is not logical to conclude that the legislature intended for the meaning of TPP for apportionment purposes to be the same as for COGS purposes. Rather, it is more logical to interpret the meaning of TPP in the apportionment and sales tax rules consistently, with the important

distinction for COGS purposes being the intellectual property described by Section 171.1012(a)(3)(A)(ii).

Under this analysis, CGG agrees that for purposes of sales tax and apportionment—which do not include "sound recordings, film, . . . and other similar property" in their definitions of TPP—its seismic data should be treated as "intangible" property. *See TGS-NOPEC,* 340 S.W.3d at 444. However, that does not prevent the seismic data from qualifying as a "good" for purposes of the COGS deduction because the Legislature chose to treat this specific type of otherwise intangible property as a form of "artificial TPP" exclusively for this purpose, and CGG's seismic data satisfies the applicable definition.

> b. CGG's seismic data satisfies the definition in Section 171.1012(a)(3)(A)(ii).

Section 171.1012(a)(3)(A)(ii) treats "films, sound recordings, . . . and other similar property" (*i.e.,* intellectual property that is otherwise intangible) as an artificial form of TPP for purposes of the COGS deduction. CGG's seismic data satisfies each element of the (A)(ii) definition because: (1) seismic data is the type of intellectual property described therein; and (2) at the time CGG incurs the costs to produce the data, CGG intends to mass distribute it (3) in a form that is substantially unaltered, regardless of the

means or methods of distribution or the medium in which it is distributed. *See* Tex. Tax Code § 171.1012(a)(3)(A)(ii).

First, CGG's seismic data falls within the statute's broad definition of intellectual property. The Legislature provided an expansive list, drafted in non-exclusive terms, of the types of property that qualifies, described by both type and characteristic: "films, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound." CGG's seismic data is "similar" to the described types of visual and sound recordings, which convey unique information that could not be organically duplicated by another creator.

The Comptroller claims that CGG's seismic data "is nothing like the items listed" because it lacks "esthetic, narrative, musical, or artistic value." *Appellants' Brief*, p.40. This aligns with the Comptroller's trial argument that the property had to be "creative" and could not be "scientific" to qualify under Section 171.1012(a)(3)(A)(ii). (3.RR.120; 4.RR.P.Ex.46, p.149, 158). Nothing in the statute expressly or impliedly limits the definition in the manner sought by the Comptroller. And, as the Comptroller's counsel acknowledged regarding this theory, "I can't prove it. I don't have a precedent for you." (3.RR.154). Moreover, this argument would disqualify

producers of documentaries from claiming the COGS deduction. Nothing in the language of the statute supports such a narrow reading.

Second, the record demonstrates that CGG intends to mass distribute the seismic images at the time it incurs the costs to produce them. CGG does not even consider undertaking the expense of funding the production of seismic images for purposes of the MCDL unless there is substantial interest by E&P companies for the geological information of a particular location. (2.RR.118, 121; 4.RR.P.Ex.18; 5.RR.D.Ex.14, p.16: "In developing our multi-client data library, we carefully select survey opportunities in order to maximize our return on investment."). The entire purpose of CGG incurring these costs is to sell the data to "as many people as possible," including all 12,000 of the Texas companies registered in the oil and gas drilling industry. (2.RR.118-20, 125; 3.RR.13, 17, 20; 4.RR.P.Ex.18; 4.RR.P.Ex.25; 5.RR.D.Ex.35, p.8, 12-13, 16-17). Comptroller representative Pai admitted that the "mass distribution" requirement is satisfied by a taxpayer's *intent* to mass distribute, not its ability to actually do so: She agreed a taxpayer would qualify if it "intended to sell to as many people as possible [but] no one bought it." (4.RR.P.Ex.46, p.157). On this record, the Comptroller cannot satisfy his burden of demonstrating that there is "no evidence" to support

Findings of Fact 12-13, especially when the evidence is viewed in favor of the judgment. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

The Comptroller defines "mass" as "a large number of individuals," yet claims CGG's intent to license its MCDL products to all 12,000 industry members is not enough. To the extent this argument is based on a belief that a taxpayer must intend to distribute its product to masses "of the general public" rather than a specific industry, this argument fails. Nothing in the statute provides such a limitation, and it is easy to understand how it would not be true for many types of niche musical or artistic products that the Comptroller admits qualify under Section 171.1012(a)(3)(A)(ii).[14]

The Comptroller's remaining two "mass distribution" complaints are red herrings. *Appellants' Brief*, p.38. First, just as discussed in regard to why CGG's activities are sufficiently connected to drilling projects, the statute does not require a taxpayer to maintain accounting records and parse its costs based on the timing or success of a project. This argument should be rejected because it ignores the economic realities of CGG's business.

---

[14] The Comptroller argues that CGG's sales to *proprietary* customers do not satisfy the "mass distribution" prong. *Appellants' Brief*, p.37. CGG has never argued that it qualifies as an "actual owner" of goods based on its proprietary sales. But contrary to the Comptroller's argument, this does not provide a basis to reverse the judgment. It is only necessary that CGG qualify to claim the COGS deduction under subsection (i) as an actual or deemed owner of goods based on some aspect of its business. Then, as a combined group making a single election for which deduction method to apply, CGG is entitled to deduct all of its allowable costs. *Infra*, Argument IV.B.

*Supra*, Argument III.A.2.  Second, the Comptroller's claim that "[o]ne would not expect data . . . regard[ed] as a 'trade secret' to be mass distributed" misses the point.[15]  CGG's MCDL products are sold on a non-exclusive basis to whomever will pay for them.  Just because the purchaser is prohibited from re-distributing those products (as is the purchaser of a copy of any movie, song, or image described by this section) does not show a lack of intent for the owner/seller of the product to mass-distribute it for profit.

Third, CGG intends to distribute the data in a form that is substantially unaltered.  Here, it is critical to understand the difference between altering the underlying data versus providing that data by various means or on various mediums.  The underlying data (originally captured as sound waves from the earth's surface) never changes.  Only its format changes.  By applying algorithms and other techniques to interpret the underlying data, CGG is able to make that same data (originally captured as a sound recording) appear in the medium of a high-resolution image.

This is no different than taking the underlying text of a Shakespeare play, originally written with ink and paper, and reprinting it for sale as a hardback book, and then as a digital version, or performing it as a play, or

---

[15]     The Comptroller cites a case regarding a discovery dispute over the production of seismic data in a legal dispute, which is readily-distinguishable and has nothing to do with the treatment of such property as "tangible" or "intangible" for tax purposes.  *See In re Bass*, 113 S.W.3d 735 (Tex. 2003).

making it into a movie. The underlying content of Shakespeare's work remains substantially unaltered regardless of the medium or means of distribution, and he (or his heirs or assignees) remain the owners of that underlying intellectual property.

The statute expressly provides that a product will qualify as artificial TPP under Section 171.1012(a)(3)(A)(ii) "without regard to the means or methods of distribution or the medium in which the property is embodied," and that the distribution can be intended in "any medium in which the property is embodied." Comptroller representative Pai confirmed the purpose of the statute is to allow the taxpayer to distribute the product "through as many means as are - - are profitable to the distributer." (4.RR.P.Ex.46, p.67; *see also* p.138-139 (agreeing that this was a reasonable interpretation as shown by 4.RR.P.Ex.34)).

Based on the foregoing, the record sufficiently supports the conclusion that the seismic data products sold through CGG's MCDL are "goods" or "artificial TPP" within the definition of Section 171.1012(a)(3)(A)(ii). As such, the Legislature has placed these products outside of the definition of "intangible property" for purposes of the COGS deduction.

## IV. ALL OF CGG'S COSTS ARE ALLOWED FOR THE COGS DEDUCTION.

Once a taxpayer qualifies as an actual or deemed owner of goods under Section 171.1012(i), it is instructed to calculate its total costs of goods sold as allowed "by this section," including all of the direct and indirect costs allowed for deduction under subsections (c), (d), and (f). That is exactly the computation CGG performed to arrive at its COGS deduction of $567 million. The trial court correctly concluded that CGG was entitled to claim the COGS deduction in this full amount. (CR.250-51, 268 at COL.8-9).

For the first time on appeal, the Comptroller seeks to parse these costs between CGG's lines of business (proprietary and MCDL), its activities (acquisition and processing), and/or the assorted categories of allowable costs under subsections (c), (d), and (f). Recognizing that it failed to preserve these arguments at trial, the Comptroller seeks a remand for a second bite at the apple to parse the amount of CGG's deduction. Not only has this argument been waived, it is also legally incorrect and inconsistent with recent policy announced by the Comptroller.

### A. The Comptroller Waived Any Challenge to the Actual Costs Deducted.

CGG provided evidence that classified all of the costs included in its COGS deduction into each of the categories allowed under Texas Tax Code

63

Sections 171.1012(c), (d), and (f). (3.RR.40-41, 48-52, 54-56; 4.RR.P.Ex.19, 48). The Comptroller limited its opposition to a holistic challenge of whether CGG qualified for the COGS deduction under Section 171.1012(i). The Comptroller preserved no argument that, assuming CGG qualifies, the specific costs included in its COGS calculation are not allowed for deduction (in whole or in part) under Section 171.1012(c), (d), or (f). (*See* 2.RR.16 (Comptroller's counsel conceded that he was "not even fighting [CGG] on [its costs], except as to whether they're eligible for [the COGS deduction of] them."); 3.RR.58-63, 91-98 (Comptroller's counsel asked no questions of relevant witnesses to challenge the allowance of specific costs under subsections (c), (d), or (f)); 3.RR.98; 4.RR.P.Ex.3, p.P000128 (Comptroller's auditor agreed that he "did not challenge any of the categories or the amounts that are reflected on [CGG's COGS calculation spreadsheet]"); CR.41-66 (Comptroller's trial brief raises no challenge to allowance of specific costs under subsections (c), (d), or (f))).

Thus, the Comptroller has waived any challenge to which of CGG's costs should be included in the calculation. The only question before this Court is the threshold issue of whether CGG *qualified* for the COGS deduction. Assuming that the Court agrees that CGG qualifies as an actual or deemed owner under Section 171.1012(i), then it should affirm the

64

judgment in full allowing CGG the full amount of its COGS deduction. There is no legitimate basis for a remand in this circumstance.

### B. The Statute Does Not Require Parsing of Costs.

The Comptroller agrees that taxpayers who qualify for the COGS deduction as "actual owners" may deduct any of the costs allowed by (c), (d), and (f). *Appellants' Brief*, p. 44-45. However the Comptroller argues that taxpayers who qualify as "deemed owners" should be treated differently under the same provision. *Id.*, p.19, 43-49 (arguing that deemed owners are entitled to deduct only their "labor and material costs" and not the remainder of costs allowed by subsections (c), (d), and (f)). This contravenes the plain language of the statute and ignores the Comptroller's own admissions at trial.

Regarding both "actual" and "deemed" owners, Section 171.1012(i) plainly states that the taxpayer may subtract the costs as provided "by" or "under" "this section." Tex. Tax Code § 171.1012(i), *first and third sentences*. The reference to "this section" must mean the entirety of Section 171.1012 because the Legislature did not say "subsection," which it knew how to do if that is what had been intended. *See generally* Tex. Tax Code § 171.1012 (containing 12 separate references to "subsections").

The Comptroller's auditor, Gary Dullum, agreed that "as allowed by this section" means all of the costs under (c), (d), and (f). (3.RR.72-73). The Comptroller's prior letter rulings also support this interpretation. (4.RR.P.Ex.28, ¶ 4: explaining that the taxpayer is entitled to deduct all costs allowed by 171.1012(c), (d), and (f), not just labor and material costs; 4.RR.P.Ex.32: in regard to a deemed owner, explaining that "Section 171.1012(c), (d), and (f) lists the types of costs included in the COGS deduction for all types of businesses.").

Additionally, nothing in the statute requires parsing of costs between business lines or activities. Instead, the taxpayer simply must qualify by some portion of its business activity to elect the COGS deduction under subsection (i), and then it may calculate all of the costs allowed by subsections (c), (d), and (e). This is equally true for single businesses as it is for integrated companies like CGG and Newpark, which report their taxes on a combined group basis, making a single election for the calculation method used. As this Court explained:

> [I]t would be inconsistent [with the statutory purpose] to treat subsection 171.1014(e)(1) [regarding combined reporting] as an additional substantive limitation that would require each member's business activity to be viewed in complete isolation from the combined group. This conclusion is directly supported by subsection 171.1014(d–1), which states that "[a] member of a combined group may claim as costs of goods sold those

66

costs that qualify under Section 171.1012 if the goods for which the costs are incurred are owned by another member of the combined group." As this provision indicates, a <u>member that does not sell any goods itself may nevertheless deduct as cost of goods sold those expenses it incurs to sell goods owned by another member of the combined group</u>. . . .

It would be inconsistent with this framework to consider a combined group as a single taxable entity, require each member to take the same general deduction, but nevertheless treat each member as an isolated entity for purposes of determining <u>eligibility</u> to take the cost-of-goods-sold deduction.  This conclusion would lead to the absurd result that <u>a company that had no subsidiaries could take all costs-of-goods-sold deductions allowable under section 171.1012, but if that same company created subsidiaries it could potentially lose substantial cost-of-goods-sold deductions because each subsidiary might not sell goods in the ordinary course of its business</u>.

*Newpark*, 422 S.W.3d at 52 (internal citations omitted) (emphasis added).

Finally, the Comptroller's position that the includable costs are limited to only those associated with particular business activities is belied by his recent public pronouncement that businesses incurring research costs may deduct them as COGS even if the taxpayer doesn't produce any of the goods it sells.  *See* Texas Comptroller of Public Accounts, *Letter Ruling* 201504069L (April 23, 2015) (STAR document available at http://aixtcp.cpa.state.tx.us/opendocs/open32/201504069l.html).

## V.   NO DEFERENCE IS OWED TO THE COMPTROLLER'S POSITIONS.

As a default argument throughout his brief, the Comptroller contends that this Court must defer to his positions either because the Comptroller is charged with enforcement of the tax code or because the COGS deduction is an "exemption" rather than an "exclusion."  Both arguments lack merit.

"[A] precondition to deference to an agency's interpretation of a statute is ambiguity."  *Am. Multi-Cinema, Inc. v. Hegar*, No. 03-14-00397-CV, -- S.W.3d --, 2015 WL 1967877, *3-4 (Tex. App.—Austin Apr. 30, 2015, no. pet. h.) (citing *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (describing agency-deference doctrine)).  Section 171.1012 is not ambiguous, so no deference is owed to the Comptroller's positions.  *Newpark*, 422 S.W.3d at 56 n.9.

In any event, such deference is not required where the agency's interpretation "is plainly erroneous or inconsistent" with the controlling statute.  *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 & n.10 (Tex. 2013); *USA Waste Servs., Inc. v. Strayhorn*, 150 S.W.3d 491, 494 (Tex. App.—Austin 2004, pet. denied). Consequently, this Court need not defer to the Comptroller's flawed interpretations of Section 171.1012.

Finally, the Comptroller incorrectly asserts that this Court should interpret the COGS deduction as an exemption from tax and, on that basis

hold CGG to stricter rules of construction and a higher burden of proof.  The COGS deduction is not an exemption.  It is a method used to arrive at "margin," the tax base adopted by the legislature, which is akin to an "exclusion."  "Exemptions," on the other hand, make special reductions to that base after it is calculated (allowing a taxpayer to avoid paying the tax completely).  These are specifically identified and treated separately in the code.  *See* Tex. Tax Code §§ 171.051-.088.  Because the same concerns of equality and uniformity do not arise with exclusions and deductions as they do with exemptions, the stricter rules applicable to exemptions should not be imposed on taxpayers claiming exclusions or deductions.  Instead, this Court should construe the COGS deduction strictly against the Comptroller and liberally in favor of CGG, and require CGG to prove its entitlement by a preponderance of the evidence.  *See Am. Multi-Cinema,* 2015 WL 1967877, at \*3; *Roark Amusement & Vending, L.P. v. Combs,* 2011 WL 255535 (Tex. App.—Austin Jan. 26, 2011), *aff'd by* 422 S.W.3d 632 (Tex. 2013).

In urging otherwise, the Comptroller relies on an overly-broad interpretation of *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 606 (Tex. App.—Austin 2000, pet. denied).  *Upjohn* involved the former "earned surplus tax," which is fundamentally different than the current "margin tax."  The taxpayer in *Upjohn* sought a special deduction, imposed after the calculation

69

of the tax base, which would have allowed it to avoid tax for food and health care supplies. *Id.* at 605. This was properly treated as an exemption. To the contrary, the COGS deduction, as a component of the tax-base calculation for all taxpayers, should be treated as an "exclusion."

## PRAYER

Based on the foregoing, Appellee CGG Veritas Services (U.S.), Inc. respectfully prays that this Court overrule each of the Comptroller's issues and affirm the judgment in full.[16] CGG further prays that this Court tax all costs against Appellees, in this Court and the court below, and award CGG any such other relief at law or equity to which it may be justly entitled. Tex. R. App. P. 43.4; Tex. R. Civ. P. 139.

---

[16] There is no legitimate basis to remand this case to allow the Comptroller a new opportunity to attempt to parse the costs properly included in CGG's COGS calculation. However, should a remand be ordered, CGG preserves its rights to present argument and evidence in support of its calculation.

Respectfully submitted,

**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**
301 Congress Ave., Suite 1950
Austin, Texas 78701
Telephone: (512) 542-9898
Telecopier: (512) 542-9899

By: */s/ Amanda G. Taylor*
    Amanda Taylor
    ataylor@textaxlaw.com
    State Bar No. 24045921
    James F. Martens
    jmartens@textaxlaw.com
    State Bar No. 13050720
    Lacy L. Leonard
    lleonard@textaxlaw.com
    State Bar No. 24040561
    Danielle V. Ahlrich
    dahlrich@textaxlaw.com
    State Bar No. 24059215

    ATTORNEYS FOR APPELLEE
    CGG VERITAS SERVICES (U.S.), INC.


# CERTIFICATE OF COMPLIANCE

I hereby certify that this Appellee's Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i) because it contains 14,696 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

    */s/ Amanda G. Taylor*
    Amanda Taylor

# CERTIFICATE OF SERVICE

Pursuant to the Texas Rules of Appellate Procedure, a true and correct copy of the foregoing was served *via e-service* on counsel listed below, on the 20th day of July, 2015. Tex. R. App. P. 9.5.

Joseph D. Hughes
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL P.O.
Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-2923
(512) 474-2697 [fax]
jody.hughes@texasattorneygeneral.gov

Charles Eldred
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL,
FINANCIAL AND TAX LITIGATION DIVISION
P.O. Box 12548
Austin, Texas 78711
(512) 463-1745
(512) 477-2348 [fax]
charles.eldred@texasattorneygeneral.gov

                           */s/ Amanda G. Taylor*
                           Amanda Taylor

## FRANCHISE TAX
## ASSIGNMENT PLANNING, ACTIVITIES AND RESULTS

**Reporting Entity Name:** CGGVeritas Services (U.S.), Inc.
**Taxpayer Number:** ███████
**Organization Type:** Foreign Profit Corporation
**Tax Type:** Franchise
**Assignment Period:** 2008 thru 2008
**Assignment Type:** Original FVAR
**Assignment Reason:** Other: COGS Project

---

**Taxpayer's principal representative(s) and title(s) of those contacted:**

**Name:** Stephen Marshall, Tax Director
    **Phone:** (832)351-8828     e-mail: steve.marshall@cggveritas.com
**Name:**
    **Phone:**     e-mail:
**Name:**
    **Phone:**     e-mail:

---

**Lead Auditor:** Gary E. Dulhum

**Assisting Auditor(s):**

**Total Hours:** 3

**For FVAR:**
Estimated tax liability/credit told to taxpayer:  $ 1,301,568.86

APPX.1 (P.Ex.4)

ASSIGNMENT PLAN continued                                        FRANCHISE (13)
Entity Name: CGGVeritas Services (U.S.) Inc.
TP#: ▬▬▬▬▬

## COMPTROLLER OF PUBLIC ACCOUNTS
## AUDITOR'S INDEPENDENCE STATEMENT

The auditor has an obligation to have an independent attitude toward the audit. An independent attitude is defined as an impartial point of view which allows the auditor to act objectively and with fairness. Each staff member must promptly notify in writing the Supervisor/Team Leader, or Manager concerning any situation that would impair the staff member's or the Office's independence on an audit, or that might lead others to question it. If a staff member has any doubt about whether a situation may be an impairment, he/she should resolve the question in favor of disclosure.

1.   FAMILIARITY WITH COMPTROLLER POLICIES AND QUALITY STANDARDS: I understand the Agency, Division, and Office's policies on "Independence" and agree to follow them. I will follow the Ethics, Standards of Conduct, Professional Conduct and Personal Conduct as noted in Chapter 2 of the Employee's Handbook.

2.   POSSIBLE PERSONAL IMPAIRMENTS TO MY INDEPENDENCE ON THIS AUDIT: I have reviewed my personal situation with respect to this audit. I am not aware of any circumstances that might impair my ability to be independent on the audit or that might lead others to question it, except as indicated below:

                     (N/A = NOT APPLICABLE          P/A = POSSIBLY APPLICABLE)

|                                                                                                                                                                                                             | N/A | P/A |
|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----|-----|
| Professional, personal, official, or financial relationships that might cause the auditor to limit the extent of the inquiry, to limit disclosure, or to weaken audit findings in any way (includes relative employed by the taxpayer under audit) | [X] | [ ] |
| Preconceived ideas toward individuals, groups, or objectives of a particular program that could bias the audit                                                                                             | [X] | [ ] |
| Previous responsibility for decision-making or managing an entity that would affect current operations of the entity or program being audited                                                              | [X] | [ ] |
| Biases, including those induced by political or social convictions, that result from employment in or loyalty to a particular group                                                                        | [X] | [ ] |
| Financial interest, direct or substantial indirect, in the audited entity or program                                                                                                                      | [X] | [ ] |
| Offer of or application for a position with the taxpayer or related entity during the preceding year. (Note: an offer of or intention to apply for a position with the taxpayer or related entity once the audit is in progress must also be reported) | [X] | [ ] |

[ ] Additional comments attached: (Details may be communicated to the audit manager separately by confidential memorandum)

3.   RESPONSIBILITY TO UPDATE THIS DISCLOSURE: I understand that I am also responsible to make timely written notification in the event any other circumstance arises during the course of this audit that might impair my independence.

Employee:  Gary E. Dullum
Job Title:  Tax Auditor
Date:  August 31, 2010

D0063

APPX.1 (P.Ex.4)

ASSIGNMENT PLAN continued                                      FRANCHISE (13)
Entity Name: CGGVeritas Services (U.S.) Inc.
TP#: ▉▉▉▉▉▉

---

## PRE-ASSIGNMENT RESEARCH

### A.1. FVAR QUESTIONNAIRE
(Attach questionnaire to back of audit plan)

Date mailed:              07/29/10

Date received:            08/09/10

Follow up letter mailed:

Signed by Authorized Representative?     (Y/N)  Y, Appears to be

### A.2. APPOINTMENT INFORMATION

---Auditor called on:        —      Taxpayer not called.

Appointment set for:        N/A

Contact:                    Steven Marshall, Tax Director

Confirmation letter sent?   (Y/N)  N        If Yes, on

Appointment rescheduled?    (Y/N)  N/A      If yes, why?

Statute waiver needed?      (Y/N)  N

### B.   HISTORY/TAX SYSTEM REVIEW

Open Collection Records:  None
      (*Must be closed if invalid or noted as valid in an AWM Notes to Reviewer comment*):

Late Returns:  None

Prior Audit (list periods):  2004 – 2007, 2001 – 2003, 1997 – 1999, 1992 - 1996

Prior Refund Claims (list periods):  None

Prior FVAR Assignments (list periods):  None

Prior BART/VDA assignments (list periods):  None

Has taxpayer ever filed for bankruptcy?  (list date filed, Bar Date, Confirmation Date):  No

**Unverified Refunds** - Check for any refunds issued on amended returns that were not verified by Audit Division before being refunded. Section 111.108 allows us four years from the refund request date to recover any refund paid in error (list periods)

**Statute of Limitations** - A timely claim for refund for the same period and tax type will toll statute for an assessment for four years from the date of the refund request (Section 111.2051). However, amended returns that do not result in credits will not toll statute. Amended returns must be filed timely. Section 111.206 covers limitations for amended returns filed resulting from a final Revenue Agent Report (RAR). All other amended returns and refund requests must be filed within statute of limitations (four years plus any tolling events).

Page 3 of 11

APPX.1 (P.Ex.4)

ASSIGNMENT PLAN continued                                    FRANCHISE (13)
Entity Name: CGGVeritas Services (U.S.) Inc.
TP#: ██████████

## ENTRANCE CONFERENCE

**Date:** 08/31/10

**Person(s) attending:** Reviewed response letter from Steve Marshall received 8/09.

### A.   TAXPAYER'S BUSINESS OPERATIONS

Business Description: Per response letter, the taxpayer's business activities are "Developing own Multi Client Data Library (MCDL) for licensing to customers: Obtain the right to conduct a seismic survey; setup and conduct a seismic survey to acqure the raw seismic data in acoustic form (sound waves); process the raw acoustic data to manufacture it into an MCDL tape ("finished product") that conatins visual representations of the geological formations in the Earth's subsurface with the block. Processing of customer' raw seismic data that is in acoustic form into finished seismic data tapes that contain graphic representations of geolgiacal formations. The finished product is then shipped to the customer.

Has this corporation been acquired?        (Y/N) N
Purchased another corporation?             (Y/N) Unknown
Merger during the assignment period?       (Y/N) Unknown
(If any of the above questions are yes, pushdown accounting, pre-acquisition earnings, or merger credit may apply.)

### B.   RECORDS TO EXAMINE
1.   In all cases
    a.   Detail Description of the entities activities.
    b.   List of items included in cost of goods sold calculation for 2008 and/or 2009
    c.   Reported affiliate NAICS codes
2.   If applicable
    a.   Detail or summary cost of goods sold workpapers
    b.   Cost of goods sold by affiliate workpapers
    c.   Corporate website (for detail of entity activities)

### C.   FILE MAINTENANCE

FEI# on XIMAST?          (Y/N)  Y          Updated?

NAICS Code correct?      (Y/N)  Y          Updated?

SIC Code correct?        (Y/N)  Y          Updated?

Mailing address correct? (Y/N)  Y          Updated?

### D.   ADDITIONAL COMMENTS:

Page 4 of 11

D0065

APPX.1 (P.Ex.4)

ASSIGNMENT PLAN continued                                      FRANCHISE (13)
Entity Name: CGGVeritas Services (U.S.) Inc.
TP#: ███████████

## COST OF GOODS SOLD

**NOTES:**   This assignment was limited in scope. The purpose of which was to identify
taxpayers who computed Margin by deducting Cost of Goods Sold from Total
Revenue. Based on the reporting entity's standard industry code, they are a service
provider and should not have had a Cost of Goods Sold. The taxpayer was sent a
questionnaire that asked for a detail description of the entity's activities, and a list
of items included in the calculation of the Cost of Goods sold.

Reviewed the response from the taxpayer on the questionnaire and toured the
taxpayer's web site. From the information provided, the taxpayer appears to be
only performing a service. They have developed a data library of seismic data that
they license to customers. They also will process customers' raw seismic data into
a graphic representation.

The taxpayer said "according to the decision by U.S. Fifth Circuit Court of Appeals
in *Texas Instruments Inc. v. U.S.* (39 AFTR 2d 77-1383 (551 F.2d 599),
04/27/1977), CGGV_US's seismic data tapes are tangible property. Therefore,
CGGV_US deducts the cost of goods sold to compute the margin tax."

The taxpayer is not collecting sales tax on the sale of this "tangible personal
property", according to the CICS screens on reported sales tax.

While RULE §3.588 Margin: Cost of Goods Sold (d) (10) states: "geological and
geophysical costs incurred to identify and locate property that has the potential to
produce minerals." may be part of COGS, and seismic data may fit under that
definition, the taxpayer is not the "owner of the good" – the entity actually doing
the exploration or production.

Since the documentation indicates this entity is only providing a service and not
directly producing goods, the overall COGS deduction has been denied and will be
converted to the 70% calculation.

APPX.1 (P.Ex.4)

ASSIGNMENT PLAN continued                            FRANCHISE (13)
Entity Name: CGGVeritas Services (U.S.) Inc.
TP#: ▮▮▮▮▮▮▮

---

## EXIT CONFERENCE

---

Date: 08/31/10

Person(s) attending: None. TP will be notified via mail.

Discussion of Audit Adjustments: None

Taxpayer Agrees/Disagrees/Is Noncommittal: Assumed to disagree, since taxpayer's position
      was denied.

Discuss any taxpayer disagreements: Per taxpayer's questionnaire the "finished product" is
      tangible personal property and the costs to produce it should be COGS.

Discussion of minor errors for which NO adjustments were made: None

Billing procedures and P & I explained?                (Y/N) N

Explained exit brochure?                               (Y/N) N

Was audit payment collected?                      (Y/N) N/A

Redetermination Process explained:              (Y/N) N

Reconciliation Conference offered?             (Y, N/A) N/A
      If yes: _____ Accepted _____ Declined
      (If Accepted, complete "Reconciliation Conference" pags.)

IAR Conference offered?                      (Y, N/A) N/A
      If yes: _____ Accepted _____ Declined
      *If Declined, explain*:

Other brochures/rulings given to taxpayer: None

D0067

**APPX.1 (P.Ex.4)**

ASSIGNMENT PLAN continued                                    FRANCHISE (13)
Entity Name: CGGVeritas Services (U.S.) Inc.
TP#: ███████

## LISTING OF EVENTS

| DATE | NOTES |
|------|-------|
| 07/29/10 | Cost of Goods Sold questionnaire mailed to the taxpayer. |
| 08/09/10 | Completed questionnaire received in Dallas. |
| 08/30/10 | Reviewed questionnaire response and appears that the primary business is a service and the COGS deduction should be denied. Adjustment would be over $100k, so completed an Adjustment report to submit to the Processing Center to get interest information for the P&I Waiver. |
| 08/31/10 | Reviewed response in more detail, as well as visited the taxpayer's website. Activity appears to be primarily related to the service of licensing seismic data, or processing seismic data for customers. The COGS deduction will be denied and the return will be changed to the 70% method. The taxpayer was not contacted to discuss this change. It is expected that they will file for redetermination.

Prepared documentation, updated CATS and submitted the FVAR for review and processing. |

D0068

**APPX.1 (P.Ex.4)**



CGGVeritas Services (U.S.) Inc.
10300 Town Park Dr. Attn: Tax Dept.
Houston, TX 77072-5236

RE:    Texas Taxpayer Number: ▉▉▉▉
       2008 Franchise Tax Report
       Federal Employer Identification Number: ▉▉▉▉

Dear Taxpayer:

Our review of your 2008 Texas Franchise Tax report is complete. Based on the information you provided, we have determined that your entity did not qualify for the cost of goods sold deduction.

We have recalculated your tax due, based on the documentation provided, using the allowed calculation (70 percent of revenue or E-Z if you qualified). This tax due adjustment is reflected on the enclosed Texas Notification of Exam Results. We waived the penalty on this assessment. Interest will continue to accrue until the postmark date of your payment. We included a pre-addressed envelope for your payment convenience.

If you disagree with this assessment, you may request a redetermination hearing as explained in the Taxpayer Rights Summary section of the enclosed determination; however, this request must be made within 30 days of the date of this notice.

Also enclosed is the brochure "Contesting Disagreed Audits"(Form 96-1253). Please be advised of your right to meet with an Independent Audit Reviewer (IAR).

The results of this review do not rescind or replace any previous notices you may have received regarding outstanding balances. You are liable for any amounts still due. Also, this review is not an audit and will not preclude an audit on this period in the future.

If you have any questions, please contact me in the Dallas West Audit Office at (972) 888-5300. Thank you for your cooperation.

Sincerely,

Gary E. Dullum
Auditor
gary.dullum@cpa.state.tx.us
Phone: 972/888-5300, Ext. 85758

Enclosures



**APPX.2 (P.Ex.5)**

00-240

TEXAS NOTIFICATION OF EXAM RESULTS
(TEX.TAX CODE ANN.SEC.111.008)

STATEMENT DATE
September 24, 2010

Taxpayer Name
CGGVERITAS SERVICES (U.S.) INC.

Taxpayer Number
████████████

Type of TAX
FRANCHISE TAX

Exam Period
2008 thru 2008

|                                | TOTAL          |
|--------------------------------|----------------|
| TAX                            | $ 1,301,568.86 |
| PENALTY                        | 0.00           |
| INTEREST THRU STATEMENT DATE   | 93,357.68      |
| AMOUNT DUE AS OF STATEMENT DATE | $ 1,394,926.54 |

IF PAID AFTER 09-24-2010, ADD INTEREST OF $    151.55 PER DAY THROUGH DATE OF PAYMENT.*   (SEE INTEREST RATE NOTE ON BACK.)

IF PAID AFTER 11-04-2010, ADD AN ADDITIONAL 10% PENALTY OF $    130,156.89. (TEX. TAX CODE ANN.SEC. 111.0081).

**THIS NOTIFICATION BECOMES FINAL ON 10-25-2010, unless you request a redetermination hearing by this date. If a hearing is not requested, this determination becomes final on 10-25-2010, and it is due and payable on 11-04-2010. YOUR TAXPAYER RIGHTS ARE ON THE BACK.**

The results of this exam do not rescind or replace any previous notices you may have received regarding outstanding balances. You are liable for any amounts still due. The results of this exam should not be taken as approval of your tax reporting system. Law changes and new rulings might result in different findings in future audits and you will be responsible for any taxes found owing and due.

For payment information call 1-800-531-5441, ext. 3-3900 toll-free nationwide, or call 512/463-3900.

Make your check payable to STATE COMPTROLLER and mail to Comptroller of Public Accounts 111 E. 17th Street, Austin, Texas 78774-0100.

(Cut and Return Bottom Portion with Payment)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

00-240
TEXAS NOTIFICATION OF EXAM RESULTS
(TEX.TAX CODE ANN.SEC.111.008)

STATEMENT DATE
September 24, 2010

Amount of Your Payment

Taxpayer Name & Mailing Address

CGGVERITAS SERVICES (U.S.) INC.
10300 TOWN PARK DR ATTNTAX DEPT
HOUSTON, TX 77072-5236

_____

*PMD _____

| *Tcode | *Taxpayer Number | *Period | *Audit | *Amount | *File |
|--------|------------------|---------|--------|---------|-------|
| 13060  | ████████████     | 08      | 003    | 1394926.54 | |

APPX.2 (P.Ex.5)

COGVERITAS SERVICES (U.S.) INC.
HOUSTON TX
TAX ADJUSTMENT SUMMARY

FVAR

Preparer/Date: ged 8/31/2010
TP#: ▮▮▮▮▮▮

FOR REPORT YEAR: 2008

Field Verified Adjusted Report Results

| (A) | (B) | (C) FROM: Prior Data Per Last Report/Audit/ Refund/FVAR | (D) Adjusted Amounts per Verification | (E) Verification Results - From: Col. C or Col. D |
|---|---|---|---|---|
| | REPORT TYPE: | Annual | | Annual |
| | REPORT YEAR: | 2008-LAST-11/17/08 | | 2008 |
| METHOD ELECTED: | 70%/EZ/COGS/COMP: | COGS | | COGS |
| **REVENUE** | COL.D & COL.E | | | |
| ACCOUNTING PERIOD | FORWARDED FROM | 08/01/2006 - 12/31/2007 | | 08/01/2006 - 12/31/2007 |
| 1. GROSS RECEIPTS OR SALES | Col. C | 966,763,733 | | 966,763,733 |
| 2. DIVIDENDS | Col. C | 12,006,277 | | 12,006,277 |
| 3. INTEREST | Col. C | 22,575,704 | | 22,575,704 |
| 4. RENTS | Col. C | 38,902,294 | | 38,902,294 |
| 5. ROYALTIES | Col. C | 151,415 | | 151,415 |
| 6. GAINS/LOSSES | Col. C | (8,080,220) | | (8,080,220) |
| 7. OTHER INCOME | Col. C | 31,873,888 | | 31,873,888 |
| 8. TOTAL GROSS REVENUE | SUM #1 - #7 | 1,064,193,091 | | 1,064,193,091 |
| 9. DEDUCTIONS FROM GROSS REVENUE | Col. C | 12,022,557 | | 12,022,557 |
| 10. TOTAL REVENUE | #8 - #9 | $1,052,170,534 | | $1,052,170,534 |
| 10.a. Annualized Total Revenue (# of Days) | 365 | $1,052,170,534 | | $1,052,170,534 |
| **COST OF GOODS SOLD** | | | | |
| 11. COST OF GOODS SOLD | Note (1) | 566,405,209 | 0 | 0 |
| 12. INDIRECT OR ADMIN COSTS | Note (1) | 1,195,014 | 0 | 0 |
| 13. OTHER | Col. C | 0 | | 0 |
| 14. TOTAL COST OF GOODS SOLD | SUM #11 - #13 | $567,600,223 | | $0 |
| **COMPENSATION** | | | | |
| 15. WAGES AND CASH COMPENSATION | Col. C | 0 | | 0 |
| 16. EMPLOYEE BENEFITS | Col. C | 0 | | 0 |
| 17. OTHER | Col. C | 0 | | 0 |
| 18. TOTAL COMPENSATION | SUM #15 - #17 | $0 | | $0 |
| **MARGIN** | | | | |
| 19. REVENUE (#10 X 70%) | #10 X 70% | N/A | | 736,519,374 |
| 20. REVENUE (#10 - COGS) | #10 - #14 | 484,570,311 | | 1,052,170,534 |
| 21. REVENUE (#10 - COMPENSATION) | #10 - #18 | N/A | | N/A |
| 22. MARGIN | LOWEST 19,20,21 | $484,570,311 | | $736,519,374 |
| **APPORTIONMENT FACTOR** | | | | |
| 23. GROSS RECEIPTS IN TEXAS | Col. C | 550,465,250 | | 550,465,250 |
| 24. GROSS RECEIPTS EVERYWHERE | Col. C | 1,065,524,279 | | 1,065,524,279 |
| 25. APPORTIONMENT FACTOR | #23 / #24 | 0.5166 | | 0.5166 |
| **TAXABLE MARGIN or EZ REVENUE** | | | | |
| 26. APPORTIONED: MARGIN or EZ | Margin: #22 X #25 | 250,329,023 | | 380,485,909 |
| 27. ALLOWABLE DEDUCTIONS | Col. C | 0 | | 0 |
| 28. TAXABLE AMOUNT | #26 - #27 | $250,329,023 | | $380,485,909 |
| **TAX DUE** | | | | |
| 29. TAX RATE (If Rate Changed, See Note Below.) | Col. C | 0.01000 | | 0.01000 |
| 30. TAX DUE | #28 X #29 | 2,503,290.23 | | 3,804,859.09 |
| **TAX ADJUSTMENTS** | | | | |
| 31. TAX CREDITS | Col. C | 1,251,645.12 | | 1,251,645.12 |
| 32. TAX DUE BEFORE DISCOUNT | #30 - #31 | 1,251,645.11 | | 2,553,213.97 |
| 33. DISCOUNT | | 0.00 | | 0.00 |
| 34. TAX DUE | #32-#33 | $1,251,645.11 | | $2,553,213.97 |
| 35. TAX DUE BASED ON: | | COGS | | 70% |
| 36. LESS TAX REPORTED | Tax Reports | 1,251,645.11 | | 1,251,645.11 |
| 37. TAX ADJUSTMENT | #34 - #36 | $0.00 | | $1,301,568.86 |
| 38. OTHER REFUNDS ISSUED | Other Refunds | 0.00 | | 0.00 |
| 39. OTHER FVAR REFUNDS OR ASSESSMENTS | Other FVARs | 0.00 | | 0.00 |
| 40. OTHER BART REFUNDS OR ASSESSMENTS | Other BARTs | 0.00 | | 0.00 |
| 41. OTHER AUDIT ADJUSTMENTS | Per Audit | 0.00 | | 0.00 |
| 42. NET TAX ADJUSTMENT | #37-#38-#39-#40-#41 | $0.00 | | $1,301,568.86 |

Notes:

(1) COGS Questionnaire returned indicating primarily service. Method changed to 70%

APPX.2 (P.Ex.5)

DATE: 09/22/2010
PGM: T73720
USER: DHIN450

PAGE 1
TYPE: 3
WI 5006493271510

STATE OF TEXAS
COMPTROLLER OF PUBLIC ACCOUNTS
CALCULATED MESSAGE REPORT

TAX TYPE: FRANCHISE TAX

TAXPAYER NAME: CGGVERITAS SERVICES (U.S.) INC.
ADDRESS: 10300 TOWN PARK DR ATTN:TAX DEPT
HOUSTON, TX 77072-5236

TAXPAYER NUMBER:
CALCULATION DATE: 08-30-2010
PERIODS: 08 THRU 08

| MESSAGE CODE | MESSAGE TYPE | MESSAGE PERIOD | MESSAGE |
|---|---|---|---|
| | | | 11-17-2012 IS THE STATUTE OF LIMITATIONS DATE |

DATE: 09/22/2010
PGM: T73725
USER: DHIN450

STATE OF TEXAS
COMPTROLLER OF PUBLIC ACCOUNTS
ADJUSTMENT REPORT

PAGE 1
TYPE: 3
WI 5006493271510

TAX TYPE: FRANCHISE TAX

TAXPAYER NAME: CGGVERITAS SERVICES (U.S.) INC.
ADDRESS: 10300 TOWN PARK DR ATTN:TAX DEPT
HOUSTON, TX 77072-5236

TAXPAYER NUMBER:
CALCULATION DATE: 08-30-2010
PERIODS: 08 THRU 08

| FILING PERIOD | TAX | PENALTY | INT/CR.INT | CR. ADJUST: APPLIED/ TRANSFERRED | ADJUSTED TAX | ADJUSTED PENALTY | ADJUSTED INT/CR.INT | BALANCE DUE |
|---|---|---|---|---|---|---|---|---|
| 08 | 1,301,568.86 | .00 | 89,568.81 | .00 | 1,301,568.86 | .00 | 89,568.81 | 1,391,137.67 |
| TOTAL | 1,301,568.86 | .00 | 89,568.81 | .00 | 1,301,568.86 | .00 | 89,568.81 | 1,391,137.67 |

ADDITIONAL INTEREST OF    151.554678    PER DAY ACCRUES ON A TAX BALANCE OF $  1,301,568.86    FROM  08-31-2010 THRU PAYMENT DATE

AMOUNT OF PENALTY WAIVED IS    130,156.89

AMOUNT ACCRUING INTEREST AT VARIABLE RATE IS    1,301,568.86.*

* PER ANNUM INTEREST RATES ARE SUBJECT TO CHANGE ON JANUARY 1ST OF EACH YEAR.  FOR INTEREST INFORMATION, REFER TO
PUBLICATION 98-304, OR CALL 1-877-447-2834, OR GO TO HTTP://WWW.WINDOW.STATE.TX.US/TAXINFO/INT_RATE.HTML

APPX.2 (P.Ex.5)

DATE: 09/22/2010
PGM: T73732
USER: DHIN450

STATE OF TEXAS
COMPTROLLER OF PUBLIC ACCOUNTS
TAX BASES USED FOR CALCULATIONS

PAGE: 1
TYPE: 3
WI 5006493271510

TAX TYPE: FRANCHISE TAX

TAXPAYER NAME: CGGVERITAS SERVICES (U.S.) INC.
ADDRESS: 10300 TOWN PARK DR ATTNTAX DEPT
HOUSTON, TX 77072-5236

TAXPAYER NUMBER:
CALCULATION DATE: 08-30-2010
PERIODS: 08 THRU 08

| PERIOD | TAX | TAX ACCRUING PENALTY | TAX ACCRUING INTEREST |
|---|---|---|---|
| 08 | 1,301,568.86 | .00 | 1,301,568.86 |
| TOTAL | 1,301,568.86 | .00 | 1,301,568.86 |

APPX.2 (P.Ex.5)

CGGVeritas Services (U.S.) Inc. Combined Group
Texas Franchise Tax Report Year 2008
(Accounting Year 2007)
Cost of Goods Sold

| Description | | Costs |
|---|---|---|
| Direct labor costs | $ | 163,940,154 |
| Integral materials | $ | - |
| Consumed materials | $ | 69,536,631 |
| Handling costs | $ | 1,004,184 |
| Storage costs | $ | - |
| Depreciation, depletion, & amortization | $ | 283,762,107 |
| Rental of direct use property | $ | 331,513,037 |
| Repair/maintenance of direct use property | $ | 33,186,789 |
| Direct research, experimental, etc. costs | $ | 4,134,098 |
| Geological & geophysical costs | $ | 957,514 |
| Other direct costs | $ | (213,972,144) Capitalized costs, etc. |
| Total § 171.1012(c) costs | $ | 674,062,370 |
| | | |
| Deterioration costs | $ | - |
| Obsolence costs | $ | - |
| Spoilage and abandonment costs | $ | - |
| Preproduction direct costs | $ | 106,962 |
| Postproduction direct costs | $ | - |
| Insurance costs on produced goods | $ | 7,425,828 |
| Direct use utilities | $ | 6,971,899 |
| Quality control costs | $ | 2,777,228 |
| Total § 171.1012(d) costs | $ | 17,281,917 |
| | | |
| Total § 171.1012(c) & (d) costs | $ | 691,344,287 |
| | | |
| Indirect & administrative overhead costs | $ | 29,875,350 |
| Times 4% | $ | 1,195,014 |
| Total § 171.1012(e) costs | $ | 1,195,014 |
| | | |
| Intra-group eliminations | | (124,939,078) |
| Total COGS | $ | 567,600,223 |
| | | |
| Total per TFT report | $ | 567,600,223 |

Note: This worksheet should use Excel formulas to total the data on the individual company worksheets.

PLAINTIFF'S
EXHIBIT
19
ALL-STATE LEGAL®

APPX.3 (P.Ex.19)

CGGVeritas Services (U.S.) Inc.
Texas Franchise Tax Report Year 2008
(Accounting Year 2007)
Cost of Goods Sold

| Description | | Costs |
|---|---|---|
| Direct labor costs | $ | 85,419,478 |
| Integral materials | | |
| Consumed materials | $ | 39,142,893 |
| Handling costs | $ | 352,067 |
| Storage costs | | |
| Depreciation, depletion, & amortization | $ | 123,344,171 |
| Rental of direct use property | $ | 171,239,810 |
| Repair/maintenance of direct use property | $ | 577,012 |
| Direct research, experimental, etc. costs | $ | 265,138 |
| Geological & geophysical costs | $ | 8,724 |
| Other direct costs | $ | (195,828,248) Deferred Costs and Capitalized MCDL costs and Other, net of Taxes and Licenses |
| Total § 171.1012(c) costs | $ | 224,521,045 |
| | | |
| Deterioration costs | | |
| Obsolence costs | | |
| Spoilage and abandonment costs | | |
| Preproduction direct costs | | |
| Postproduction direct costs | | |
| insurance costs on produced goods | $ | 5,365,686 |
| Direct use utilities | $ | 4,111,688 |
| Quality control costs | $ | 2,577,959 |
| Total § 171.1012(d) costs | $ | 12,055,333 |
| | | |
| Total § 171.1012(c) & (d) costs | $ | 236,576,378 |
| | | |
| Indirect & administrative overhead costs | $ | 17,136,275 |
| Times 4% | $ | 685,451 |
| Total § 171.1012(e) costs | $ | 685,451 |
| | | |
| Total COGS | $ | 237,261,829 |
| | | |
| Total per TFT workpaper | $ | 237,261,829 |

P000151

**APPX.3 (P.Ex.19)**

CGG Americas Inc.
Texas Franchise Tax Report Year 2008
(Accounting Year 2007)
Cost of Goods Sold

| Description | | Costs |
|---|---|---|
| Direct labor costs | $ | 14,829,059 |
| Integral materials | | |
| Consumed materials | $ | 820,139 |
| Handling costs | $ | 11,455 |
| Storage costs | | |
| Depreciation, depletion, & amortization | $ | 48,159,186 |
| Rental of direct use property | $ | 8,287,517 |
| Repair/maintenance of direct use property | $ | 606,083 |
| Direct research, experimental, etc. costs | $ | 3,868,960 |
| Geological & geophysical costs | | |
| Other direct costs | $ | (1,133,330) S/W license and other, net of capitalized costs |
| Total § 171.1012(c) costs | $ | 75,449,069 |
| | | |
| Deterioration costs | | |
| Obsolence costs | | |
| Spoilage and abandonment costs | | |
| Preproduction direct costs | | |
| Postproduction direct costs | | |
| Insurance costs on produced goods | $ | 85,066 |
| Direct use utilities | $ | 2,081,262 |
| Quality control costs | | |
| Total § 171.1012(d) costs | $ | 2,166,328 |
| | | |
| Total § 171.1012(c) & (d) costs | $ | 77,615,397 |
| | | |
| Indirect & administrative overhead costs | $ | 12,739,075 |
| Times 4% | $ | 509,563 |
| Total § 171.1012(e) costs | $ | 509,563 |
| | | |
| Total COGS | $ | 78,124,960 |
| | | |
| Total per TFT workpaper | $ | 78,124,960 |
| | $ | - |

P000152

APPX.3 (P.Ex.19)

CGGVeritas Land (U.S.) Inc.
Texas Franchise Tax Report Year 2008
(Accounting Year 2007)
Cost of Goods Sold

| Description | | Costs |
|---|---|---|
| Direct labor costs | $ | 40,921,769 |
| Integral materials | | |
| Consumed materials | $ | 13,619,747 |
| Handling costs | $ | 603,963 |
| Storage costs | | |
| Depreciation, depletion, & amortization | $ | 56,158,183 |
| Rental of direct use property | $ | 47,988,194 |
| Repair/maintenance of direct use property | $ | 11,207,738 |
| Direct research, experimental, etc. costs | | |
| Geological & geophysical costs | $ | 923,409 |
| Other direct costs | $ | 227,666 | Taxes & Licenses and other, net of deferred charges |
| Total § 171.1012(c) costs | $ | 171,650,669 |
| | | |
| Deterioration costs | | |
| Obsolence costs | | |
| Spoilage and abandonment costs | | |
| Preproduction direct costs | $ | 106,962 |
| Postproduction direct costs | | |
| Insurance costs on produced goods | $ | 1,211,230 |
| Direct use utilities | $ | 760,900 |
| Quality control costs | $ | 199,269 |
| Total § 171.1012(d) costs | $ | 2,278,361 |
| | | |
| Total § 171.1012(c) & (d) costs | $ | 173,929,030 |
| | | |
| Indirect & administrative overhead costs | $ | - |
| Times 4% | $ | - |
| Total § 171.1012(e) costs | $ | - |
| | | |
| Total COGS | $ | 173,929,030 |
| | | |
| Total per TFT workpaper | $ | 173,929,030 |
| | $ | - |

P000153

**APPX.3 (P.Ex.19)**

Viking Maritime Inc.
Texas Franchise Tax Report Year 2008
(Accounting Year 2007)
Cost of Goods Sold

| Description | | Costs |
|---|---|---|
| Direct labor costs | $ | 22,769,848 |
| Integral materials | | |
| Consumed materials | $ | 15,953,852 |
| Handling costs | $ | 36,699 |
| Storage costs | | |
| Depreciation, depletion, & amortization | $ | 56,100,567 |
| Rental of direct use property | $ | 103,997,516 |
| Repair/maintenance of direct use property | $ | 20,795,956 |
| Direct research, experimental, etc. costs | | |
| Geological & geophysical costs | $ | 25,381 |
| Other direct costs | $ | (17,238,232) Deferred and I/C charges, net of Taxes and licenses |
| Total § 171.1012(c) costs | $ | 202,441,587 |
| | | |
| Deterioration costs | | |
| Obsolence costs | | |
| Spoilage and abandonment costs | | |
| Preproduction direct costs | | |
| Postproduction direct costs | | |
| Insurance costs on produced goods | $ | 763,846 |
| Direct use utilities | $ | 18,049 |
| Quality control costs | | |
| Total § 171.1012(d) costs | $ | 781,895 |
| | | |
| Total § 171.1012(c) & (d) costs | $ | 203,223,482 |
| | | |
| Indirect & administrative overhead costs | $ | - |
| Times 4% | $ | |
| Total § 171.1012(e) costs | $ | 203,223,482 |
| | | |
| Intra-group eliminations | | (124,939,078) |
| Total COGS | $ | 78,284,404 |
| | | |
| Total per TFT workpaper | $ | 203,223,482 |

P000154

APPX.3 (P.Ex.19)


PLAINTIFF'S EXHIBIT 48 — ALL-STATE LEGAL®

CGGVeritas Services (U.S.) Inc. Combined Group

Texas Franchise Tax Report Year 2008

(Accounting Year 2007)

Cost of Goods Sold

LEGAL Entity: (All)

Sum of Cost Amount

| Row Labels | Column Labels ACQUISITION | DATA PROC | G&A | MCDL | Grand Total |
|---|---|---|---|---|---|
| (c)-01 Direct labor costs | 108,707,123 | 51,434,881 | | 3,798,150 | 163,940,154 |
| (c)-03 Consumed material | 67,594,375 | 1,558,427 | | 383,830 | 69,536,631 |
| (c)-04 Handling costs | 987,592 | 16,592 | | - | 1,004,184 |
| (c)-06 Depreciation, depletion, & amortization | 68,490,113 | 2,685,237 | | 212,586,758 | 283,762,108 |
| (c)-07 Rental of direct use property | 188,149,627 | 18,106,923 | | 317,409 | 206,573,959 |
| (c)-08 Repair/maintenance of direct use property | 31,319,059 | 1,837,719 | | 30,011 | 33,186,789 |
| (c)-09 Direct research, experimental, etc. costs | 265,138 | 3,868,960 | | - | 4,134,098 |
| (c)-10 Geological & geophysical costs | 957,514 | - | | - | 957,514 |
| (c)-11 Other direct costs | (194,680,814) | (30,304,157) | | 11,012,827 | (213,972,144) |
| (d)-04 Preproduction direct costs | 106,962 | | | | 106,962 |
| (d)-06 Insurance costs on produced goods | 6,939,917 | 477,851 | | 8,060 | 7,425,828 |
| (d)-07 Direct use utilities | 2,142,819 | 4,808,034 | | 21,045 | 6,971,899 |
| (d)-08 Quality control costs | 2,777,228 | - | | - | 2,777,228 |
| (e)-01 4% of Indirect & administrative overhead costs | | | 1,195,014 | | 1,195,014 |
| Grand Total | 283,756,653 | 54,490,467 | 1,195,014 | 228,158,089 | 567,600,223 |

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

V.T.C.A., Tax Code § 171.1012

§ 171.1012. Determination of Cost of Goods Sold

Effective: September 1, 2013
Currentness

(a) In this section:

(1) "Goods" means real or tangible personal property sold in the ordinary course of business of a taxable entity.

(2) "Production" includes construction, installation, manufacture, development, mining, extraction, improvement, creation, raising, or growth.

(3)(A) "Tangible personal property" means:

(i) personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner;

(ii) films, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator or any one or more third parties in a form that is not substantially altered; and

(iii) a computer program, as defined by Section 151.0031.

(B) "Tangible personal property" does not include:

(i) intangible property; or

(ii) services.

(b) Subject to Section 171.1014, a taxable entity that elects to subtract cost of goods sold for the purpose of computing its taxable margin shall determine the amount of that cost of goods sold as provided by this section.

(c) The cost of goods sold includes all direct costs of acquiring or producing the goods, including:

(1) labor costs;

(2) cost of materials that are an integral part of specific property produced;

(3) cost of materials that are consumed in the ordinary course of performing production activities;

(4) handling costs, including costs attributable to processing, assembling, repackaging, and inbound transportation costs;

(5) storage costs, including the costs of carrying, storing, or warehousing property, subject to Subsection (e);

(6) depreciation, depletion, and amortization, reported on the federal income tax return on which the report under this chapter is based, to the extent associated with and necessary for the production of goods, including recovery described by Section 197, Internal Revenue Code;

(7) the cost of renting or leasing equipment, facilities, or real property directly used for the production of the goods, including pollution control equipment and intangible drilling and dry hole costs;

(8) the cost of repairing and maintaining equipment, facilities, or real property directly used for the production of the goods, including pollution control devices;

(9) costs attributable to research, experimental, engineering, and design activities directly related to the production of the goods, including all research or experimental expenditures described by Section 174, Internal Revenue Code;

(10) geological and geophysical costs incurred to identify and locate property that has the potential to produce minerals;

(11) taxes paid in relation to acquiring or producing any material, or taxes paid in relation to services that are a direct cost of production;

(12) the cost of producing or acquiring electricity sold; and

(13) a contribution to a partnership in which the taxable entity owns an interest that is used to fund activities, the costs of which would otherwise be treated as cost of goods sold of the partnership, but only to the extent that those costs are related to goods distributed to the taxable entity as goods-in-kind in the ordinary course of production activities rather than being sold.

(d) In addition to the amounts includable under Subsection (c), the cost of goods sold includes the following costs in relation to the taxable entity's goods:

(1) deterioration of the goods;

(2) obsolescence of the goods;

(3) spoilage and abandonment, including the costs of rework labor, reclamation, and scrap;

(4) if the property is held for future production, preproduction direct costs allocable to the property, including costs of purchasing the goods and of storage and handling the goods, as provided by Subsections (c)(4) and (c)(5);

(5) postproduction direct costs allocable to the property, including storage and handling costs, as provided by Subsections (c)(4) and (c)(5);

(6) the cost of insurance on a plant or a facility, machinery, equipment, or materials directly used in the production of the goods;

(7) the cost of insurance on the produced goods;

(8) the cost of utilities, including electricity, gas, and water, directly used in the production of the goods;

(9) the costs of quality control, including replacement of defective components pursuant to standard warranty policies, inspection directly allocable to the production of the goods, and repairs and maintenance of goods; and

(10) licensing or franchise costs, including fees incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right directly associated with the goods produced.

(e) The cost of goods sold does not include the following costs in relation to the taxable entity's goods:

(1) the cost of renting or leasing equipment, facilities, or real property that is not used for the production of the goods;

(2) selling costs, including employee expenses related to sales;

(3) distribution costs, including outbound transportation costs;

(4) advertising costs;

(5) idle facility expense;

(6) rehandling costs;

(7) bidding costs, which are the costs incurred in the solicitation of contracts ultimately awarded to the taxable entity;

(8) unsuccessful bidding costs, which are the costs incurred in the solicitation of contracts not awarded to the taxable entity;

(9) interest, including interest on debt incurred or continued during the production period to finance the production of the goods;

(10) income taxes, including local, state, federal, and foreign income taxes, and franchise taxes that are assessed on the taxable entity based on income;

(11) strike expenses, including costs associated with hiring employees to replace striking personnel, but not including the wages of the replacement personnel, costs of security, and legal fees associated with settling strikes;

(12) officers' compensation;

(13) costs of operation of a facility that is:

(A) located on property owned or leased by the federal government; and

(B) managed or operated primarily to house members of the armed forces of the United States; and

(14) any compensation paid to an undocumented worker used for the production of goods. As used in this subdivision:

(A) "undocumented worker" means a person who is not lawfully entitled to be present and employed in the United States; and

(B) "goods" includes the husbandry of animals, the growing and harvesting of crops, and the severance of timber from realty.

(f) A taxable entity may subtract as a cost of goods sold indirect or administrative overhead costs, including all mixed service costs, such as security services, legal services, data processing services, accounting services, personnel operations, and general financial planning and financial management costs, that it can demonstrate are allocable to the acquisition or production of goods, except that the amount subtracted may not exceed four percent of the taxable entity's total indirect or administrative

overhead costs, including all mixed service costs. Any costs excluded under Subsection (e) may not be subtracted under this subsection.

(g) A taxable entity that is allowed a subtraction by this section for a cost of goods sold and that is subject to Section 263A, 460, or 471, Internal Revenue Code, may capitalize that cost in the same manner and to the same extent that the taxable entity capitalized that cost on its federal income tax return or may expense those costs, except for costs excluded under Subsection (e), or in accordance with Subsections (c), (d), and (f). If the taxable entity elects to capitalize costs, it must capitalize each cost allowed under this section that it capitalized on its federal income tax return. If the taxable entity later elects to begin expensing a cost that may be allowed under this section as a cost of goods sold, the entity may not deduct any cost in ending inventory from a previous report. If the taxable entity elects to expense a cost of goods sold that may be allowed under this section, a cost incurred before the first day of the period on which the report is based may not be subtracted as a cost of goods sold. If the taxable entity elects to expense a cost of goods sold and later elects to capitalize that cost of goods sold, a cost expensed on a previous report may not be capitalized.

(h) A taxable entity shall determine its cost of goods sold, except as otherwise provided by this section, in accordance with the methods used on the federal income tax return on which the report under this chapter is based. This subsection does not affect the type or category of cost of goods sold that may be subtracted under this section.

(i) A taxable entity may make a subtraction under this section in relation to the cost of goods sold only if that entity owns the goods. The determination of whether a taxable entity is an owner is based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxable entity. A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance (as the term "maintenance" is defined in 34 T.A.C. Section 3.357) of real property is considered to be an owner of that labor or materials and may include the costs, as allowed by this section, in the computation of cost of goods sold. Solely for purposes of this section, a taxable entity shall be treated as the owner of goods being manufactured or produced by the entity under a contract with the federal government, including any subcontracts that support a contract with the federal government, notwithstanding that the Federal Acquisition Regulation may require that title or risk of loss with respect to those goods be transferred to the federal government before the manufacture or production of those goods is complete.

(j) A taxable entity may not make a subtraction under this section for cost of goods sold to the extent the cost of goods sold was funded by partner contributions and deducted under Subsection (c)(13).

(k) Notwithstanding any other provision of this section, if the taxable entity is a lending institution that offers loans to the public and elects to subtract cost of goods sold, the entity, other than an entity primarily engaged in an activity described by category 5932 of the 1987 Standard Industrial Classification Manual published by the federal Office of Management and Budget, may subtract as a cost of goods sold an amount equal to interest expense. For purposes of this subsection, an entity engaged in lending to unrelated parties solely for agricultural production offers loans to the public.

(k-1) Notwithstanding any other provision of this section, the following taxable entities may subtract as a cost of goods sold the costs otherwise allowed by this section in relation to tangible personal property that the entity rents or leases in the ordinary course of business of the entity:

(1) a motor vehicle rental or leasing company that remits a tax on gross receipts imposed under Section 152.026;

(2) a heavy construction equipment rental or leasing company; and

(3) a railcar rolling stock rental or leasing company.

(k-2) This subsection applies only to a pipeline entity: (1) that owns or leases and operates the pipeline by which the product is transported for others and only to that portion of the product to which the entity does not own title; and (2) that is primarily engaged in gathering, storing, transporting, or processing crude oil, including finished petroleum products, natural gas, condensate, and natural gas liquids, except for a refinery installation that manufactures finished petroleum products from crude oil. Notwithstanding Subsection (e)(3) or (i), a pipeline entity providing services for others related to the product that the pipeline does not own and to which this subsection applies may subtract as a cost of goods sold its depreciation, operations, and maintenance costs allowed by this section related to the services provided.

(k-3) For purposes of Subsection (k-2), "processing" means the physical or mechanical removal, separation, or treatment of crude oil, including finished petroleum products, natural gas, condensate, and natural gas liquids after those materials are produced from the earth. The term does not include the chemical or biological transformation of those materials.

(l) Notwithstanding any other provision of this section, a payment made by one member of an affiliated group to another member of that affiliated group not included in the combined group may be subtracted as a cost of goods sold only if it is a transaction made at arm's length.

(m) In this section, "arm's length" means the standard of conduct under which entities that are not related parties and that have substantially equal bargaining power, each acting in its own interest, would negotiate or carry out a particular transaction.

(n) In this section, "related party" means a person, corporation, or other entity, including an entity that is treated as a pass-through or disregarded entity for purposes of federal taxation, whether the person, corporation, or entity is subject to the tax under this chapter or not, in which one person, corporation, or entity, or set of related persons, corporations, or entities, directly or indirectly owns or controls a controlling interest in another entity.

(o) If a taxable entity, including a taxable entity with respect to which cost of goods sold is determined pursuant to Section 171.1014(e)(1), whose principal business activity is film or television production or broadcasting or the distribution of tangible personal property described by Subsection (a)(3)(A)(ii), or any combination of these activities, elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described in this section in relation to the property and include depreciation, amortization, and other expenses directly related to the acquisition, production, or use of the property, including expenses for the right to broadcast or use the property.

(p) to (s) [Blank].

(t) If a taxable entity that is a movie theater elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described by this section in relation to the acquisition, production, exhibition, or use of a film or motion picture, including expenses for the right to use the film or motion picture.

**Credits**

Added by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008. Amended by Acts 2007, 80th Leg., ch. 1282, §§ 14, 15, eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 9, eff. Jan. 1, 2014; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 10(a), eff. Sept. 1, 2013.

Notes of Decisions (1)

V. T. C. A., Tax Code § 171.1012, TX TAX § 171.1012
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## Editor's and Revisor's Notes (8)

**HISTORICAL AND STATUTORY NOTES**

**2015 Main Volume**

Acts 2007, 80th Leg., ch. 1282 in subsec. (a)(3)(A)(ii) inserted "live and prerecorded television and radio programs" following "videotapes,", substituted ", without regard to the means or methods of distribution or the medium in which the property is embodied," for "by the creator of the property" following "or sound", and deleted "tangible" preceding "medium in which the property is embodied"; in subsec. (c)(6) inserted "reported on the federal income tax return on which the report under this chapter is based,"; rewrote subsec. (g); in subsec. (h) substituted "used on the federal income tax return on which the report under this chapter is based" for "permitted by federal statutes and regulations"; rewrote subsec. (k); and added subsec. (o).     Prior thereto subsecs. (g) and (k) read:

"(g)  A taxable entity that is allowed a subtraction by this section for a cost of goods sold and that is subject to Section 263A  ,   460   , or   471, Internal Revenue Code   , shall capitalize that cost in the same manner and to the same extent that the taxable entity is required or allowed to capitalize the cost under federal law and regulations, except for costs excluded under Subsection (e), or in accordance with Subsections (c), (d), and (f). "

"(k)  Notwithstanding any other provision of this section, if the taxable entity is a lending institution that offers loans to the public and elects to subtract cost of goods sold, the entity may subtract as a cost of goods sold an amount equal to interest expense."

Acts 2013, 83rd Leg., ch. 1232 (H.B. 500) added subsecs. (k-2), (k-3), and (t).

Section 10(b) of Acts 2013, 83rd Leg., ch. 1232 (H.B. 500) provides:

" Section 171.1012(t), Tax Code , as added by this section, is a clarification of existing law and does not imply that existing law may be construed as inconsistent with the law as amended by this section."

Section 19 of Acts 2013, 83rd Leg., ch. 1232 (H.B. 500) provides:

"This Act applies only to a report originally due on or after the effective date [Sept. 1, 2013] of this Act."

Vernon's Texas Statutes and Codes Annotated
    Tax Code (Refs & Annos)
        Title 2. State Taxation (Refs & Annos)
            Subtitle F. Franchise Tax (Refs & Annos)
                Chapter 171. Franchise Tax (Refs & Annos)
                    Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

V.T.C.A., Tax Code § 171.103

§ 171.103. Determination of Gross Receipts from Business Done in This State for Margin

Effective: January 1, 2014
Currentness

(a) Subject to Section 171.1055, in apportioning margin, the gross receipts of a taxable entity from its business done in this state is the sum of the taxable entity's receipts from:

(1) each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale;

(2) each service performed in this state, except that receipts derived from servicing loans secured by real property are in this state if the real property is located in this state;

(3) each rental of property situated in this state;

(4) the use of a patent, copyright, trademark, franchise, or license in this state;

(5) each sale of real property located in this state, including royalties from oil, gas, or other mineral interests; and

(6) other business done in this state.

(b) A combined group shall include in its gross receipts computed under Subsection (a) the gross receipts of each taxable entity that is a member of the combined group and that has a nexus with this state for the purpose of taxation.

(c) Repealed by Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15.

(d) Repealed by Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15.

**Credits**
Acts 1981, 67th Leg., p. 1697, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 15, § 1, eff. Oct. 2, 1984; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.06, eff. Jan. 1, 1992; Acts 1997, 75th Leg., ch. 1185, § 5, eff.

Jan. 1, 1998; Amended and consolidated this section with V.T.C.A., Tax Code § 171.1032 by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 20, eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 15, eff. Jan. 1, 2014.

Notes of Decisions (49)

V. T. C. A., Tax Code § 171.103, TX TAX § 171.103
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Editor's and Revisor's Notes (36)**

**HISTORICAL AND STATUTORY NOTES**

**2015 Main Volume**

Acts 2006, 79th Leg., 3rd C.S., ch. 1 rewrote this section, which prior thereto read:

"§ 171.103.    Determination of Gross Receipts From Business Done in This State for Taxable Capital

"In apportioning taxable capital, the gross receipts of a corporation from its business done in this state is the sum of the corporation's receipts from:

"(1)  each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale, and each sale of tangible personal property shipped from this state to a purchaser in another state in which the seller is not subject to taxation;

"(2)  each service performed in this state;

"(3)  each rental of property situated in this state;

"(4)  the use of a patent, copyright, trademark, franchise, or license in this state;

"(5)  each sale of real property located in this state, including royalties from oil, gas, or other mineral interests; and

"(6)  other business done in this state."

Acts 2007, 80th Leg., ch. 1282 added subsecs. (c) and (d).

Section 38 of Acts 2007, 80th Leg., ch. 1282 provides:

"This Act applies only to a report originally due on or after the effective date [Jan. 1, 2008] of this Act.

"The legislature intends that each change in law made to the following sections of the Tax Code by this Act be considered as a clarification of existing law and not imply that the existing law may be construed as inconsistent with the law as amended by this Act:

"(2)  171.103(5);"

Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), repealed subsecs. (c) and (d), which prior thereto read:

"(c) A taxable entity that is a combined group shall include in a report filed under Section 171.201 or 171.202, for each member of the combined group that does not have nexus with this state for the purpose of taxation:

"(1) the gross receipts computed under Subsection (a); and

"(2) the gross receipts computed under Subsection (a) that are subject to taxation in another state under a throwback law or regulation.

"(d) The information required by Subsection (c) may be used for informational purposes only.  The comptroller shall adopt rules as necessary to enforce the reporting requirement prescribed by Subsection (c). "

Section 19 of Acts 2013, 83rd Leg., ch. 1232 (H.B. 500) provides:

"This Act applies only to a report originally due on or after the effective date of this Act [Jan. 1, 2014]. "

**Prior Laws:**

Acts 1907, 30th Leg., 1st C.S., p. 503.

Rev.Civ.St.1911, art. 7393.

Acts 1919, 36th Leg., p. 100.

Acts 1930, 41st Leg., 5th C.S., p. 220, ch. 68, § 2.

Acts 1931, 42nd Leg., p. 441, ch. 265, § 1.

Acts 1941, 47th Leg., p. 269, ch. 184, art. 8, § 1.

Acts 1949, 51st Leg., p. 975, ch. 536, § 1.

Acts 1951, 52nd Leg., p. 695, ch. 402, § 9.

Acts 1954, 53rd Leg., 1st C.S., p. 3, ch. 2, art. 3, § 1.

Acts 1955, 54th Leg., p. 1080, ch. 404, art. 4, § 1.

Acts 1957, 55th Leg., p. 1179, ch. 394, § 1.

Vernon's Ann.Civ.St. art. 7084 .

Acts 1959, 56th Leg., 3rd C.S., p. 187, ch. 1.

Acts 1969, 61st Leg., 2nd C.S., ch. 1, art. 7, § 1.

V.A.T.S. Tax.-Gen. art. 12.02, § (1)(b).

> Vernon's Texas Statutes and Codes Annotated
>   Tax Code (Refs & Annos)
>     Title 2. State Taxation (Refs & Annos)
>       Subtitle E. Sales, Excise, and Use Taxes
>         Chapter 151. Limited Sales, Excise, and Use Tax (Refs & Annos)
>           Subchapter A. General Provisions

V.T.C.A., Tax Code § 151.009

§ 151.009. "Tangible Personal Property"

Currentness

"Tangible personal property" means personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner, and, for the purposes of this chapter, the term includes a computer program and a telephone prepaid calling card.

**Credits**

Acts 1981, 67th Leg., p. 1547, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 6, § 2, eff. Oct. 2, 1984; Acts 1987, 70th Leg., 2nd C.S., ch. 5, art. 1, pt. 4, § 11; Acts 1997, 75th Leg., ch. 1040, § 16, eff. Sept. 1, 1997.

Notes of Decisions (9)

V. T. C. A., Tax Code § 151.009, TX TAX § 151.009
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Editor's and Revisor's Notes (6)**

**HISTORICAL AND STATUTORY NOTES**

**2015 Main Volume**

**Prior Laws:**

Acts 1941, 47th Leg., p. 269, ch. 184, art. 10, § 1.

Acts 1950, 51st Leg., 1st C.S., p. 10, ch. 2, art. 10, § 1.

Vernon's Ann.Civ.St. arts. 7047I, §§ 1, 1a, 1 1/2 ; 7047 *I* -1, § 1.

Acts 1959, 56th Leg., 3rd C.S., p. 187, ch. 1, arts. 20.01 to 20.20.

Acts 1961, 57th Leg., 1st C.S., p. 71, ch. 24, art. 1, § 1.

V.A.T.S. Tax.-Gen. art. 20.01, § (P).

Notice sent: (Final) Interlocutory None
Disp Parties: All
Disp code: (CVD)/ CLS 4-UIS
Redact pgs:
Judge: TS  Clerk KAH

DC          BK14262 PG9

Filed in The District Court
of Travis County, Texas

SEP 17 2014

At _____ 5:00 P.M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-12-001316

| | | |
|---|---|---|
| CGGVERITAS SERVICES (U.S.) INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SUSAN COMBS, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS; AND GREG ABBOTT, ATTORNEY GENERAL OF THE STATE OF TEXAS, | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | 353rd JUDICIAL DISTRICT |

## FINAL JUDGMENT

On February 18 and 19, 2014, the Court conducted phase one of a bifurcated bench trial of the above-entitled matter. The issue in phase one of the trial was the proper amount of Plaintiff's cost-of-goods-sold deduction in Report Year 2008. After considering the pleadings, briefings, authorities, statutes, evidence, and argument presented by the parties, the Court rules that the Plaintiff is entitled to claim a cost-of-goods-sold deduction in the amount of $567,600,223.

The issue in phase two of the bifurcated trial is the proper amount of Plaintiff's research and development credit in Report Year 2008. The parties have stipulated that the amount of the research and development carry forward credit available for Plaintiff to claim beginning with its 2008 Texas Franchise Tax Report is $782,268.

The Court orders that Plaintiff's tax due for Report Year 2008 was $1,721,022.23. The Comptroller is ordered to issue an appropriate check, including appropriate statutory interest under TEX. TAX CODE §112.060. This judgment shall not bar CGG from recovering additional

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Final Judgment
Page 1 of 2

250

franchise taxes arising from a final disposition of its apportionment claims presently pending at the administrative level.

The parties will bear their own attorney's fees and costs of court.

This is a final, appealable order. All relief not expressly granted is denied.

SIGNED this ___17TH___ day of September, 2014.

_____
THE HONORABLE TIM SULAK,
Judge Presiding
353rd District court
Travis County, Texas

APPROVED AS TO FORM:

/s/ James F. Martens
**James F. Martens**
jmartens@textaxlaw.com
Texas Bar No. 13050720
**Lacy L. Leonard**
lleonard@textaxlaw.com
Texas Bar No. 24040561
**Danielle V. Ahlrich**
dahlrich@textaxlaw.com
Texas Bar No. 24059215
Martens, Todd, Leonard & Taylor
301 Congress Ave., Ste. 1950
Austin, TX 78701
(512) 542-9898 – Telephone
(512) 542-9899 – Fax

Attorneys for the Plaintiff

_____
**Charles K. Eldred**
Charles.Eldred@texasattorneygeneral.gov
Texas Bar No. 00793681
**Erika R. Sams**
Erika.Sams@texasattorneygeneral.gov
Texas Bar No. 24083784
Assistant Attorney General
Financial and Tax Litigation Division
P.O. Box 12548
Austin, TX 78711-2548
(512) 463-8897 – Telephone
(512) 457-4423 – Fax

Attorneys for the Defendants

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Final Judgment
Page 2 of 2

251

CAUSE NO. D-1-GN-12-001316

| | | |
|---|---|---|
| CGGVERITAS SERVICES (U.S.) INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SUSAN COMBS, | § | TRAVIS COUNTY, TEXAS |
| COMPTROLLER OF PUBLIC | § | |
| ACCOUNTS OF THE STATE OF TEXAS; | § | |
| AND GREG ABBOTT, ATTORNEY | § | |
| GENERAL OF THE STATE OF TEXAS, | § | |
| | § | |
| Defendants. | § | 353rd JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the pleadings, briefings, authorities, statutes, evidence, and argument presented

by the parties, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. CGGVeritas Services (U.S.) Inc. ("CGG") satisfied all procedural prerequisites to file a protest suit under Texas Tax Code Chapter 112.

2. CGG is a fully-integrated geo-sciences company that performs exploratory testing to produce seismic sound recordings and images that CGG sells on both a proprietary basis and licenses on a multi-client basis.

   - *See, e.g., Plaintiff's Ex. 7, 9, 10, 14, 17; Testimony of Bob Montgomery*

3. CGG uses tools and devices that impact the Earth's surface and sub-surface to cause disturbances, the effect of which CGG captures as seismic sound recordings.

   - *See, e.g., Plaintiff's Ex. 22, 47; Defendant's Ex. 3-12, 15; Testimony of Bob Montgomery*

4. CGG processes the seismic sound recordings into visual images of the Earth's subsurface, using sophisticated computer programs and proprietary algorithms.

   - *See, e.g., Plaintiff's Ex. 22, 47; Defendant's Ex. 3-12, 15; Testimony of Bob Montgomery*

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 1 of 6

265

5.     CGG's customers are generally oil and gas exploration and production companies.

       • *See, e.g., Testimony of Bob Montgomery*

6.     Customers purchase, license, and use CGG's seismic sound recordings and images to determine where to explore and drill for oil and gas.

       • *See, e.g., Plaintiff's Ex. 7, 14; Testimony of Bob Montgomery*

7.     CGG's seismic services and products are an integral, essential, and direct component of the oil and gas drilling process.

       • *See, e.g., Plaintiff's Ex. 7, 14; Testimony of Bob Montgomery*

8.     In performing seismic work, CGG furnishes labor, including the expenditure of employee effort to acquire seismic data and to create seismic surveys and images.

       • *See, e.g., Plaintiff's Ex. 7; Testimony of Bob Montgomery*

9.     As a necessary part of the seismic labor furnished by CGG, CGG furnishes materials, such as dynamite, geophones, airguns, marine vessels, and vibroseis trucks.

       • *See, e.g., Plaintiff's Ex. 7, 9; Testimony of Bob Montgomery*

10.    CGG creates and furnishes seismic sound recordings and images to customers for use in oil and gas drilling projects.

       • *See, e.g., Plaintiff's Ex. 7, 14; Testimony of Bob Montgomery*

11.    CGG's non-proprietary seismic sound recordings and images are held for licensure to the public through its multi-client data library ("MCDL").

       • *See, e.g., Plaintiff's Ex. 10, 17, 18; Testimony of Bob Montgomery*

12.    Multiple CGG customers have licensed the same product from CGG's multi-client data library.

       • *See, e.g., Testimony of Bob Montgomery*

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 2 of 6

266

13. At the time that costs are incurred to produce seismic sound recordings and images to be sold through CGG's multi-client data library, CGG intends or believes it reasonably likely that any medium in which its seismic product will be embodied will be mass-distributed by CGG for licensure to as many customers as possible in a form that is not substantially altered.

- *See, e.g., Plaintiff's Ex. 25; Testimony of Bob Montgomery*

14. For Franchise Tax Report Year 2008, CGG originally paid $1,251,645.11, which was calculated using a cost-of-goods-sold deduction of $567,600,223.

- *See, e.g., Plaintiff's Ex. 1; Testimony of Listya Diyah*

15. CGG's $567,600,223 cost-of-goods sold deduction, was comprised of:
   a. $674,062,370 of costs under Tex. Tax Code § 171.1012(c); plus
   b. $17,281,917 of costs under Tex. Tax Code § 171.1012(d); and
   c. $1,195,014 of costs under Tex. Tax Code § 171.1012(e); less
   d. $124,939,078 for intra-group eliminations.

- *See, e.g., Plaintiff's Ex. 19, 48; Testimony of Listya Diyah*

16. On September 24, 2010, the Comptroller issued a Notice that entirely disallowed CGG's cost-of-goods-sold deduction and assessed $1,301,568.86 in additional franchise tax due, plus $93,357.68 in interest.

- *See, e.g., Plaintiff's Ex. 5; Testimony of Listya Diyah*

17. On April 17, 2012, after dismissal of an administrative suit prior to hearing, the Comptroller issued an updated Notice that assessed the same amount of additional franchise tax due, but increased the interest due to $179,850.42.

- *See, e.g., Plaintiff's Original Petition; Testimony of Listya Diyah*

18. On May 2, 2012, CGG timely paid the additional franchise tax assessment with all interest due as of that date (totaling $1,483,232.96) under protest in compliance with the statute, and then filed this suit seeking a refund.

- *See, e.g., Plaintiff's Original Petition Ex. 6; Testimony of Listya Diyah*

19. Any finding of fact that is more properly characterized as a conclusion of law shall be considered a conclusion of law.

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 3 of 6

267

# Conclusions of Law

1. CGG furnishes labor and materials to projects for the construction, improvement, remodeling, repair, or industrial maintenance of oil and gas wells within the meaning of Tex. Tax Code § 171.1012(i)

2. CGG's seismic sound recordings and images qualify as "tangible personal property" under Tex. Tax Code § 171.1012(a)(3)(A)(ii).

3. Oil and gas wells constitute real property for purposes of Tex. Tax Code § 171.1012(i).

4. CGG is eligible for the cost-of-goods-sold deduction under the third sentence of Tex. Tax Code § 171.1012(i).

5. CGG's seismic sound recordings and images contained within its multi-client data library constitute "tangible personal property" under Tex. Tax Code § 171.1012(3)(A)(ii).

6. Through its multi-client data library, CGG licenses "goods" in the ordinary course of business within the meaning of Tex. Tax Code § 171.1012(a)(1).

7. CGG is eligible for the cost-of-goods-sold deduction under Tex. Tax Code § 171.1012(a)(1), 171.1012(a)(3)(A)(ii), and 171.1012(i).

8. Each of the costs that CGG included in its cost-of-goods-sold deduction were allowed by Tex. Tax Code § 171.1012(c), (d) and (f).

9. CGG is entitled to claim a cost-of-goods-sold deduction in the amount of $567,600,223 for franchise tax Report Year 2008.

10. The parties stipulated that the amount of the research and development ("R&D") carry-forward credit available for CGG to claim beginning with its 2008 Texas Franchise Tax Report is $782,268.

11. Using the above-stated cost-of-goods-sold deduction and applying the above-stated R&D credit to CGG's franchise tax calculation for Report Year 2008 based on its originally-used apportionment factor of 0.5166, CGG's franchise tax due for Report Year 2008 is $1,721,022.23.

12. The Court's judgment shall not bar CGG from recovering additional franchise taxes arising from a final disposition of its apportionment claims presently pending at the administrative level.

13. Any conclusion of law that is more properly characterized as a finding of fact shall be considered a finding of fact.

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 4 of 6

268

SIGNED this _____13TH_____ day of October, 2014.

THE HONORABLE TIM SULAK,
Judge Presiding
353rd District court
Travis County, Texas

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 5 of 6

269

/s/ Amanda G. Taylor

**James F. Martens**
jmartens@textaxlaw.com
Texas Bar No. 13050720
**Lacy L. Leonard**
lleonard@textaxlaw.com
Texas Bar No. 24040561
**Amanda G. Taylor**
ataylor@textaxlaw.com
Texas Bar No. 24045921
**Danielle V. Ahlrich**
dahlrich@textaxlaw.com
Texas Bar No. 24059215
Martens, Todd, Leonard & Taylor
301 Congress Ave., Ste. 1950
Austin, TX 78701
(512) 542-9898 – Telephone
(512) 542-9899 – Fax


Attorneys for the Plaintiff

**Charles K. Eldred**
Charles.Eldred@texasattorneygeneral.gov
Texas Bar No. 00793681
**Erika R. Sams**
Erika.Sams@texasattorneygeneral.gov
Texas Bar No. 24083784
Assistant Attorney General
Financial and Tax Litigation Division
P.O. Box 12548
Austin, TX 78711-2548
(512) 463-8897 – Telephone
(512) 457-4423 – Fax


Attorneys for the Defendants

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 6 of 6

270



Dallas West Audit Office
2655 Villa Creek Drive, Suite 270   Dallas, Texas 75234-7316
Phone: (972) 888-5300   Fax: (972) 488-1826

July 29, 2010

CGGVERITAS Services (US) Inc.
10300 Town Park Dr.
Attn: Tax Dept.
Houston, Tx 77072

RE: Texas Taxpayer Number: █████████
       2008 and 2009 Franchise Tax Report(s)
       Federal Employer Identification Number: ███████

Dear Taxpayer:

According to our records, your entity filed the 2008 and 2009 Texas Franchise Tax report(s) deducting cost of goods sold to compute margin. We are conducting a review of your account to verify that your entity qualified for the cost of goods sold deduction. This review is not an audit and will not preclude an audit on this period in the future.

Comptroller's Rule 3.588 explains the criteria for deducting cost of goods sold. This rule is available on our website at www.window.state.tx.us/taxinfo/franchise/. Please note that an entity providing services is generally not eligible to deduct cost of goods sold.

Please complete the enclosed form and mail your response to the address above within 15 days from the date of this letter. Include any substantiating schedules and workpapers that support how the cost of goods sold deduction was calculated.

If we do not receive your response within 15 days from the date of this letter, the cost of goods sold deduction will be disallowed and a deficiency determination bill will be generated for the additional franchise tax plus any applicable penalties and interest.

Thank you in advance for your cooperation in this matter.

Sincerely,

Gary Dullum
Auditor
Gary.Dullum@cpa.state.tx.us
Phone: 972.888.5379, Ext.42379

*8/06/10*

Enclosures



ALL-STATE LEGAL®
PLAINTIFF'S EXHIBIT
2


**CGGVERITAS**

Date: August 6, 2010

ATTN: Mr. Gary Dullum
Texas Comptroller of Public Accounts
2655 Villa Creek Drive, Suite 270
Dallas, Texas 75234-7316

Transmittal: Questionnaire dated July 29, 2010
Texas Taxpayer Number: ▓▓▓▓▓▓
CGGVeritas Services (US) Inc.
2008 and 2009 Franchise Tax Reports

**Received**

**AUG 0 9 2010**

**Dallas West Audit
Comptroller of Public Accounts**

**See attached completed questionnaire**

---
CGGVeritas Services Inc.
10300 Town Park Drive
Houston, TX 77072

Tel 832.351.8895

cggveritas.com      A member of the CGGVeritas Group.



ALL-STATE LEGAL® PLAINTIFF'S EXHIBIT 3

CGGVERITAS Services (US) Inc.

July 29, 2010

**Please complete fully the required information below:**

Entity Name: _____ CGGVeritas Services (US) Inc. _____

Texas Taxpayer #: _____ █████████ _____ FEIN: _____ ████████ _____

Address: _____ 10300 Town Park Drive _____ City, State ZIP: _____ Houston, TX 77072 _____

Person to Contact: _____ Steven Marshall _____ Phone: _____ 832-351-8828 _____

E-mail Address: _____ steve.marshall@cggveritas.com _____

Detailed description of the entity's activities: _____

_____ See Statement 1 attached. _____

_____

_____

_____

_____

Provide a list of the items included in the cost of goods sold deduction for year(s) 2008 and 2009 and their corresponding dollar value:

_____ See Statement 2 attached. _____

_____

_____

_____

_____

Authorized Signature:

Signed by: _____ [signature] _____ Printed Name: _____ Vincent Thielen _____

Title (must be Officer, Director, Partner or Owner): _____ Vice President _____ Date: _____ 6 Aug 10 _____

P000126

CGGVeritas Services (US) Inc.
Taxpayer Number: ███████
Texas activities

CGGVeritas Services (US) Inc. (CGGV_US) business activities:

- Developing own Multi Client Data Library (MCDL) for licensing to customers: Obtain the right to conduct a seismic survey; setup and conduct a seismic survey to acquire the raw seismic data in acoustic form (sound waves); process the raw acoustic data to manufacture it into an MCDL tape ("finished product") that contains visual representations of the geological formations in the Earth's subsurface within the block.

- Processing of customers' raw seismic data that is in acoustic form into finished seismic data tapes that contain graphic representations of geological formations. The finished product is then shipped to the customer.

According to the decision by U.S. Fifth Circuit Court of Appeals in *Texas Instruments Inc. v. U.S.* (39 AFTR 2d 77-1383 (551 F.2d 599), 04/27/1977), CGGV_US's seismic data tapes are tangible property. Therefore, CGGV_US deducts the cost of goods sold to compute margin tax.

Statement 1

CGGVeritas Services (US) Inc.
Taxpayer Id. ███████
Cost of Goods Sold 2009 and 2008

| Texas franchise tax period | 2009 | 2008 |
|---|---|---|
| Tax period ending | 12/31/2008 | 12/31/2007 |
| Item description | Amount | Amount |
| Production costs capitalized IRC §263(A) | (305,913,774) | (211,891,672) |
| Recovery of capitalized production costs IRC §263(A) | 401,675,160 | 206,050,670 |
| Wages and salaries of production activities | 153,757,989 | 152,656,841 |
| Rent | 163,730,862 | 163,111,225 |
| Depreciation | 25,691,566 | 77,976,420 |
| Repair and maintenance | 49,246,372 | 36,994,668 |
| Subcontractors | 36,264,558 | 64,451,022 |
| Supplies/fuel and lube | 71,373,455 | 67,535,688 |
| Other costs of production | 19,065,082 | 5,651,387 |
| R&D expenses | 7,458,090 | 3,868,960 |
| COGS as filed | 622,349,360 | 566,405,209 |

Statement 2

P000128

**Texas Comptroller of Public Accounts     STAR System**

201406920L

DATE:        June 10, 2014

TO:    Denise Stewart, Audit Division
          Robin Robinson, General Counsel

FROM:        Teresa Bostick, Tax Policy Division

SUBJECT:  Policy change based on TITAN and NEWPARK

ISSUE
Based on the courts' language and analysis in TITAN and NEWPARK, we are
revising the policy with regard to subcontracting payments eligible for
exclusion under Section 171.1011(g)(3) and qualifying activities for the COGS
deduction under Section 171.1012(i).

BACKGROUND
The court in TITAN found that Titan Transportation, L.P. (Titan), which is in
the business of hauling, delivering, and depositing aggregate at real property
construction sites, was entitled to exclude from revenue, pursuant to Section
171.1011(g)(3), payments the taxpayer made to its subcontractors providing this
service for its customers.

Newpark Resources, Inc. (Newpark), an oil field service business, was the
reporting entity for a combined group which included its subsidiary, Newpark
Environmental Services, L.L.C. (NES).  The court in NEWPARK found that Newpark
was entitled to take a COGS deduction under Section 171.1012(i) for NES's
activities of removal and disposal of waste materials from oil and gas well
drilling sites.

REVISED POLICY
This change has immediate effect and a taxable entity may file an amended
franchise tax report for years that are open within the statute of limitations.

Section 171.1011(g)(3) states, "A taxable entity shall exclude from its total
revenue…only the following flow-through funds that are mandated by contract to
be distributed to other entities: subcontracting payments handled by the
taxable entity to provide services, labor, or materials in connection with the
actual or proposed design, construction, remodeling, or repair of improvements
on real property or the location of the boundaries of real property."

Under the revised policy, subcontracting payments which qualify as flow-through
funds under Section 171.1011(g) because they are mandated by contract to be
distributed to other entities, and have a reasonable nexus to the actual or
proposed design, construction, remodeling, or repair of improvements on real
property or the location of boundaries of real property, may be excluded from
revenue pursuant to Section 171.1011(g)(3). A payment is mandated by contract
to be distributed to other entities if the taxable entity has a contract with

its customers providing that subcontractors may be used and payment to the subcontractors, if used, must be made from the funds paid to the taxable entity. Please keep in mind that TITAN is being appealed on the basis that there was no contract in effect involving flow-through funds because the funds at issue were not mandated by contract to be distributed to other entities. Instead, the contract at issue was an ordinary contract between two parties for the provision of services in the regular course of business, as described in Section 171.1011(i).

With regard to the COGS deduction, Section 171.1012(i) states, "A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance of real property is considered to be an owner of that labor or materials and may include the costs, as allowed by this section, in the computation of costs of goods sold."

Under the revised policy, we are expanding the interpretation of what is considered to be furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance of real property and will no longer require an entity to actually physically touch the property or make a change to the property to qualify for the COGS deduction, regardless of whether the entity is furnishing the labor or materials to a member of the entity's combined group or if the entity is a single entity filer.

The policy changes are similar for both Sections 171.1011(g)(3) and 171.1012(i), but there are slight differences in how the policy will apply to the respective sections.  For instance, the policy for both Sections will permit industries such as transportation companies delivering aggregate and other similar materials to a construction site, waste removal companies, demolition companies, and inspectors, among others, to claim either an exclusion from revenue – provided the transaction meets the contractual requirement of flow-through funds – or a COGS deduction.  Although not new, one slight difference between the Sections is that Section 171.1011(g)(3) uses the term "proposed" – absent from Section 171.1012(i) – which may permit costs for activities performed by architects and engineers to qualify as exclusions from revenue, without regard to whether construction occurs.

Costs considered too far removed from the construction, improvement, remodeling, repair, or industrial maintenance of real property do not qualify for either an exclusion from revenue or a COGS deduction.  Entities providing services that are defined as "service costs" under Rule 3.588(b)(9) are too far removed and do not qualify for either an exclusion from revenue or a COGS deduction.  Examples of these costs include legal services and accounting services.

Further, the revised policy does not change the treatment of taxable entities renting or leasing equipment to others for use in or during such projects. Section 171.1012(k-1) still limits the COGS deduction to taxpayers renting or leasing certain items to others.  Taxpayers who rent or lease equipment other than heavy construction equipment, such as fencing or port-a-potties, to others for use in projects for the construction, improvement, remodeling, repair or industrial maintenance of real property, are not eligible for the COGS deduction under Section 171.1012.

ACCESSION NUMBER: 201406920L
SUPERSEDED: N
DOCUMENT TYPE: L
DATE: 06/18/2014
TAX TYPE: Franchise

**Texas Comptroller of Public Accounts    STAR System**

201504069L

Date:        April 23, 2015

To:          Denise Stewart, Director, Audit Division

From:        Teresa Bostick, Director, Tax Policy Division

**Subject:**  Tax Code Section 171.1012(c)(9) - Cost of Goods Sold for
Research, Experimental, Engineering, and Design Activities


### Issue

Whether a taxable entity that is not the producer of goods it sells, because it
contracts out the manufacturing of the product, can include in costs of goods
sold (COGS) expenses for research, experimental, engineering, and design
activities related to those products.

### Relevant Authorities

Texas Tax Code Section171.1012(c)(9) Internal Revenue Code Section 174 Treas.
Regs. Section1.174-1 through 1.174-4

### Discussion

Tax Code Section171.1012(c)(9) states, "the cost of goods sold includes all
direct costs of acquiring or producing goods, including costs attributable to
research, experimental, engineering, and design activities directly related to
the production of the goods, including all research or experimental
expenditures described by Section 174, Internal Revenue Code (IRC)."

Under prior policy COGS deductions for a taxable entity that was not the
producer of the goods were limited to acquisition, storage, handling, and other
costs specified in Tax Code Section171.1012(c) and (d) not related to
production.  Costs directly related to the production of goods that were
typically allowed to a producer, such as research, experimental, engineering,
and design activity costs, were not allowed as a COGS deduction for a taxable
entity that was not the producer of the goods.

Upon further review, Tax Policy determined that a taxable entity who is
eligible for COGS may claim as COGS all research and experimental costs
described by Section 174 of the IRC, regardless of whether the taxable entity
is considered the producer of the goods.

Section 174 of the IRC does not define research and experimental *costs*;
however, related Treas. Reg. Section1.174-2 does provide a definition of
research and experimental *expenditures.* Treas. Reg. Section1.174-2(a)(1)
states, "The term *research or experimental expenditures*, as used in section

174, means expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense." Treas. Reg. Sections1.174-2(a)(1)-(2) also describe what costs are generally included in the term *research and experimental expenditures* and "…includes all such costs incident to the development or improvement of a product."

Based on these authorities, regardless of whether the taxable entity is the producer of the good or not, the taxable entity may include in its COGS deduction research, experimental, engineering, and design activity costs, including all research or experimental expenditures described by Section 174 of the IRC relating to goods it sells.

This policy is effective for all open periods within the statute of limitations and future periods.


ACCESSION NUMBER: 201504069L
SUPERSEDED: N
DOCUMENT TYPE: L
DATE: 04/24/2015
TAX TYPE: Franchise

# Merriam-Webster's Collegiate® Dictionary

## ELEVENTH EDITION



Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 2012 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data

Merriam-Webster's collegiate dictionary. — Eleventh ed.
    p.    cm.
  Includes index.
  ISBN 978-0-87779-807-1   (Laminated unindexed : alk. paper)
  ISBN 978-0-87779-808-8   (Jacketed hardcover unindexed : alk. paper)
  ISBN 978-0-87779-809-5   (Jacketed hardcover with digital download : alk. paper)
  ISBN 978-0-87779-810-1   (Leatherlook with digital download : alk. paper)
  ISBN 978-0-87779-813-2   (Canadian)
  ISBN 978-0-87779-814-9   (International)
    1. English language—Dictionaries. I. Title: Collegiate dictionary. II. Merriam-Webster, Inc.
  PE1628.M36    2003
  423—dc21
                                              2003003674
                                                CIP

Merriam-Webster's Collegiate® Dictionary, Eleventh Edition, principal copyright 2003

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

16th Printing Quad Graphics Versailles KY January 2012

**mat·ting** *vt* (1549) **1 :** to provide with a mat or mat-ting ⟨*dirt* and filth *matted* her hair⟩ ... into a tangled mass ... ~ *vi* **:** to become matted ... to form a dense mass ... so as to form a ... **1** *also* **matie** *or* **matt :** to ... ; mat·ting (1602) **2 :** to provide (a picture) with ..., glass, or color) matte

... dull color, unpolished surface, fr. *mat*, adj. — more at ... : a border going around a picture between picture and ... the frame

... MATRIX 2a

... \, matar to kill] (1681) **:** a bullfighter ... n [Sp, fr. *matar* to kill] (1681) **:** a bullfighter ... and who kills the bull in a bullfight ... principal role *macche*, fr. OE *gemæcca* mate, equal; akin to OE ... [ME *macche*, ... — more at MAKE] (bef. 12c) **1 a :** a person or thing ... **b :** one able to cope with another **c :** an ... **2 :** a pair suitably associated ⟨carpet and curtains ... **3 a :** a contest between two or more parties ⟨a golf ~⟩ ⟨a ... a shouting ~⟩ **b :** a contest (as in tennis or volleyball) ... when one player or side wins a specified number of sets or ... **1 a :** to encounter successfully as an antagonist **b** (1) ... competition or opposition (2) **:** to provide with a worthy ... in comparison **2 :** to join or give in marriage **3** ... **c :** to set in opposition equal or harmonizing attributes (2) ... put in a set possessing equal or harmonizing attributes (2) ... to correspond **:** SUIT ⟨~*ed* programs to local needs⟩ **b** (1) ... counterpart of; *also* **:** to compare favorably with (2) **:** to ... with ⟨the jacket ~*ed* the pants⟩ **c :** to provide with a ... **d :** to provide funds complementary to ⟨employers may ... employee contribution —D. J. Miller⟩ **4 :** to fit together or ... able for fitting together **5 a :** to flip or toss (coins) and com-... posed faces **b :** to toss coins with ~ *vi* **:** to be a counterpart —

**match·a·ble** \'ma-chə-bəl\ *adj* — **match·er** *n*

... [ME *macche, meeche* candlewick, fr. AF *meche*] (1549) **1 :** a ... prepared wick or cord formerly used in firing firearms or ... **2 :** a short slender piece of flammable material (as wood) ... with a combustible mixture that bursts into flame when slightly ... through friction (as by being scratched against a rough surface)

**match·board** \'mach-,bȯrd\ *n* (ca. ... : a board with a groove cut ... one edge and a tongue along ... other so as to fit snugly with ... edges of similarly cut boards

**match·book** \-,bȯk\ *n* (1937) **:** a ... folder containing rows of ... matches



matchboard

**match·box** \-,bäks\ *n* (1786) **:** a box for matches

**match·less** \-ləs\ *adj* (ca. 1530) **:** having no equal **:** PEERLESS ⟨a ~ ... of the valley⟩ — **match·less·ly** *adv*

**match·lock** \-,läk\ *n* (ca. 1637) **1 :** a musket equipped with a ... **2 :** a slow-burning match lowered over a hole in the ... of a musket to ignite the charge

**match·mak·er** \-,mā-kər\ *n* (1638) **:** one that arranges a match; *esp* ... who tries to bring two unmarried individuals together in an at-... to promote a marriage — **match·mak·ing** \-,kiŋ\ *n*

**match play** *n* (1893) **:** golf competition in which the winner is the per-... team winning the greater number of holes — compare STROKE ...

**match point** *n* (1921) **:** a situation (as in tennis) in which one player or ... will win the match by winning the next point; *also* **:** the point itself

**match·stick** \'mach-,stik\ *n* (1791) **1 :** a slender piece esp. of wood ... which a match is made **2 :** something resembling a matchstick ... slenderness ⟨cut a carrot into ~*s*⟩

**match·up** \-,əp\ *n* (1959) **:** ¹MATCH

**match·wood** \-,wȯd\ *n* (1786) **:** small pieces of wood **:** SPLINTERS

... mät\ *vt* **mat·ed; mat·ing** [ME, fr. AF *mater*, fr. *mat*, n., check-... ultim. fr. Ar *māt* (in *shāh māt*)] (14c) **:** CHECKMATE 2

... [ME, prob. fr. MLG *māt*; akin to OE *gemetta* guest at one's ta-... food — more at MEAT] (14c) **1 a** (1) **:** ASSOCIATE, COMPAN-... *chiefly Brit* **:** an assistant to a more skilled worker **:** HELPER ... **b** *archaic* **:** FRIEND, BUDDY — often used as a familiar form of ad-... below the captain **:** MATCH, PEER **2 :** a deck officer on a merchant ship ... esp. a married couple **3 :** one of a pair: as **a :** either member of ... animals **c :** either of two matched objects

... **mat·ed; mat·ing** *vt* (1509) **1** *archaic* **:** EQUAL, MATCH **2 :** to ... together **:** COUPLE **3 a :** to join together as mates **b :** to ... a mate for ~ *vi* **1 :** to become mated ⟨gears that ~ well⟩ **2** ...

... **ma·te** \'mä-,tā\ *n* [F & AmerSp; F *maté*, fr. AmerSp *mate* ... vessel for drinking it, fr. Quechua *mati* vessel] (1758) **1 :** a tea-... beverage drunk esp. in So. America **2 :** a So. American shrub or ... *Ilex paraguariensis*) of the holly family whose leaves and shoots ... in making maté; *also* **:** these leaves and shoots

... \'mat-,lō, 'ma-tə-\ *n* [F, fr. MF, fr. MD *mattenoot*, lit., bed-... (ca. 1847) *Brit* **:** SAILOR

... \,ma-tə-'lōt, mat-'lōt\ *n* [F, lit., sailor's wife, fr. *matelot*] (ca. ... a stew made usu. of fish in a seasoned wine sauce

... \'mä-tər\ *n* [L — more at MOTHER] (ca. 1859) *chiefly Brit* ...

**ma·ter·fa·mil·i·as** \,mä-tər-fə-'mi-lē-əs, ,mä-\ *n* [L, fr. *mater* + *familias*, ... gen. of *familia* household — more at FAMILY] (1756) **:** a wom-... who is head of a household

**ma·te·ri·al** \mə-'tir-ē-əl\ *adj* [ME *materiel*, fr. MF & LL; MF, fr. LL *ma-... teria* matter — more at MATTER] (14c) **1 a** (1) **:** relat-... derived from, or consisting of matter; *esp* **:** PHYSICAL ⟨the ~ ... (2) **:** BODILY ⟨~ needs⟩ **b** (1) **:** of or relating to matter rather ... ⟨~ cause⟩ (2) **:** of or relating to the subject matter of rea-... **:** EMPIRICAL ⟨~ knowledge⟩ **2 :** having real importance ... consequences ⟨facts ~ to the investigation⟩ **3 a :** being of a ... or worldly nature **b :** relating to or concerned with physical ... than spiritual or intellectual things ⟨~ progress⟩ — **ma·te·ri-... ...ē-ə-lē\ *adv* — **ma·te·ri·al·ness** *n*

---

**syn** MATERIAL, PHYSICAL, CORPOREAL, PHENOMENAL, SENSIBLE, OB-
JECTIVE mean of or belonging to actuality. MATERIAL implies forma-
tion out of tangible matter; used in contrast with *spiritual* or *ideal* it
may connote the mundane, crass, or grasping ⟨*material* values⟩.
PHYSICAL applies to what is perceived directly by the senses and may
contrast with *mental, spiritual*, or *imaginary* ⟨the *physical* benefits of
exercise⟩. CORPOREAL implies having the tangible qualities of a body
such as shape, size, or resistance to force ⟨artists have portrayed an-
gels as *corporeal* beings⟩. PHENOMENAL applies to what is known or
perceived through the senses rather than by intuition or rational de-
duction ⟨scientists concerned with the *phenomenal* world⟩. SENSIBLE
stresses the capability of readily or forcibly impressing the senses ⟨the
earth's rotation is not *sensible* to us⟩. OBJECTIVE may stress material
or independent existence apart from a subject perceiving it ⟨no *objec-
tive* evidence of damage⟩. **syn** see in addition RELEVANT

²**material** *n* (1556) **1 a** (1) **: the elements, constituents, or substances of
which something is composed or can be made** (2) **:** matter that has
qualities which give it individuality and by which it may be categorized
⟨sticky ~⟩ ⟨explosive ~*s*⟩ **b** (1) **: something (as data) that may be
worked into a more finished form** ⟨~ for a biography⟩ (2) **:** some-
thing used for or made the object of study ⟨~ for the next semester⟩
(3) **:** a performer's repertoire ⟨a comedian's ~⟩ **c :** MATTER 3b **d**
**:** CLOTH **e :** a person potentially suited to some pursuit ⟨varsity ~⟩
⟨leadership ~⟩ **2 a :** apparatus necessary for doing or making some-
thing ⟨writing ~*s*⟩ **b :** MATÉRIEL

**ma·te·ri·al·ise** *Brit var of* MATERIALIZE

**ma·te·ri·al·ism** \mə-'tir-ē-ə-,li-zəm\ *n* (1733) **1 a :** a theory that phys-
ical matter is the only or fundamental reality and that all being and
processes and phenomena can be explained as manifestations or results
of matter **b :** a doctrine that the only or the highest values or objec-
tives lie in material well-being and in the furtherance of material
progress **c :** a doctrine that economic or social change is materially
caused — compare HISTORICAL MATERIALISM **2 :** a preoccupation
with or stress upon material rather than intellectual or spiritual things
— **ma·te·ri·al·ist** \-list\ *n or adj* — **ma·te·ri·al·is·tic** \-,tir-ē-ə-'lis-tik\
*adj* — **ma·te·ri·al·is·ti·cal·ly** \-ti-k(ə-)lē\ *adv*

**ma·te·ri·al·i·ty** \mə-,tir-ē-'a-lə-tē\ *n, pl* **-ties** (1570) **1 :** the quality or
state of being material **2 :** something that is material

**ma·te·ri·al·i·za·tion** \mə-,tir-ē-ə-lə-'zā-shən\ *n* (1843) **1 :** the action of
materializing or becoming materialized **2 :** something that has been
materialized; *esp* **:** APPARITION

**ma·te·ri·al·ize** \mə-'tir-ē-ə-,līz\ *vb* **-ized; -iz·ing** *vt* (1710) **1 a :** to
make material **:** OBJECTIFY **b :** to cause to appear in bodily form ⟨~
the spirits of the dead⟩ **2 :** to cause to be materialistic ~ *vi* **1 :** to as-
sume bodily form **2 a :** to appear esp. suddenly **b :** to come into ex-
istence — **ma·te·ri·al·iz·er** *n*

**materials science** *n* (1956) **:** the scientific study of the properties and
applications of materials of construction or manufacture (as ceramics,
metals, polymers, and composites) — **materials scientist** *n*

**ma·te·ria med·i·ca** \mə-'tir-ē-ə-'me-di-kə\ *n* [NL, lit., medical matter]
(1663) **1 :** substances used in the composition of medical remedies
**:** DRUGS, MEDICINE **2 a :** a branch of medical science that deals with
the sources, nature, properties, and preparation of drugs **b :** a treatise
on materia medica

**ma·té·ri·el** *or* **ma·te·ri·el** \mə-,tir-ē-'el\ *n* [F *matériel*, fr. *matériel*, adj.]
(1819) **:** equipment, apparatus, and supplies used by an organization or
institution

**ma·ter·nal** \mə-'tər-nᵊl\ *adj* [ME, fr. MF & ML; MF *maternel*, fr. ML
*maternalis*, fr. L *maternus*, fr. *mater* mother — more at MOTHER] (15c)
**1 :** of, relating to, belonging to, or characteristic of a mother **:** MOTH-
ERLY **2 a :** related through a mother ⟨his ~ aunt⟩ **b :** inherited or
derived from the female parent ⟨~ genes⟩ — **ma·ter·nal·ly** \-nᵊl-ē\
*adv*

¹**ma·ter·ni·ty** \mə-'tər-nə-tē\ *n, pl* **-ties** (1611) **1 a :** the quality or state
of being a mother **:** MOTHERHOOD **b :** the qualities of a mother
**:** MOTHERLINESS **2 :** a hospital facility designed for the care of wom-
en before and during childbirth and for the care of newborn babies

²**maternity** *adj* (1893) **1 :** designed for wear during pregnancy ⟨a ~
dress⟩ **2 :** effective for the period close to and including childbirth
⟨~ leave⟩

**mat·ey** \'mā-tē\ *adj* (1915) *chiefly Brit* **:** COMPANIONABLE — **mat·ey-
ness** \-nəs\ *n, chiefly Brit*

¹**math** \'math\ *n* (ca. 1847) **:** MATHEMATICS

²**math** *abbr* mathematical; mathematician

**math·e·mat·i·cal** \,math-'ma-ti-kəl, ,ma-thi-\ *also* **math·e·mat·ic**
\-tik\ *adj* [ME *mathematicalle*, fr. L *mathematicus*, fr. Gk *mathē-
matikos*, fr. *mathēmat-, mathēma* learning, mathematics, fr. *mantha-
nein* to learn; prob. akin to Goth *mundon* to pay attention] (15c) **1**
**:** of, relating to, or according with mathematics **2 a :** rigorously exact
**:** PRECISE **b :** CERTAIN **3 :** possible but highly improbable ⟨only a ~
chance⟩ — **math·e·mat·i·cal·ly** \-ti-k(ə-)lē\ *adv*

**mathematical expectation** *n* (1838) **:** EXPECTED VALUE

**mathematical induction** *n* (1838) **:** INDUCTION 2b

**mathematical logic** *n* (1853) **:** SYMBOLIC LOGIC

**math·e·ma·ti·cian** \,math-mə-'ti-shən, ,ma-thə-\ *n* (15c) **:** a specialist
or expert in mathematics

**math·e·mat·ics** \,math-'ma-tiks, ,ma-thə-\ *n pl but usu sing in constr*
(1573) **1 :** the science of numbers and their operations, interrelations,
combinations, generalizations, and abstractions and of space configu-
rations and their structure, measurement, transformations, and gener-
alizations **2 :** a branch of, operation in, or use of mathematics ⟨the ~
of physical chemistry⟩

**math·e·ma·ti·za·tion** \,math-mə-tə-'zā-shən, ,ma-thə-\ *n* (1908) **:** re-
duction to mathematical form — **math·e·ma·tize** \'math-mə-,tiz, 'ma-
thə-\ *vb*

**maths** \'maths\ *n pl* (1911) *chiefly Brit* **:** MATHEMATICS

---

\ə\ **abut** \ᵊ\ **kitten**, F **table** \ər\ **further** \a\ **ash** \ā\ **ace** \ä\ **mop, mar**
\aú\ **out** \ch\ **chin** \e\ **bet** \ē\ **easy** \g\ **go** \i\ **hit** \ī\ **ice** \j\ **job**
\ŋ\ **sing** \ō\ **go** \ȯ\ **law** \ȯi\ **boy** \th\ **thin** \th\ **the** \ü\ **loot** \ù\ **foot**
\y\ **yet** \zh\ **vision, beige** \k, ⁿ, œ, ᵫ, ᵜ\ *see* Guide to Pronunciation

